**James A. PITTMAN, Petitioner–Appellant,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.**

No. 96–1162.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 10, 1996.

Decided Nov. 21, 1996.

Robert E. Meldman (argued), Richard A. Petrie, Reinhart, Boerner, Vandeuren, Norris & Rieselbach, Milwaukee, WI, for Petitioner–Appellant.

Gary R. Allen, Bruce R. Ellisen, Sarah K. Knutson (argued), Department of Justice, Tax Division, Appellate Section, Washington, DC, for Respondent–Appellee.

Before CUMMINGS, FLAUM and EASTERBROOK, Circuit Judges.

CUMMINGS, Circuit Judge.

■ James A. Pittman appeals from a decision of the United States Tax Court finding him liable for taxes on 1986 and 1987 income he diverted from his business, Bee Bus Lines, Inc. ("BBL"), and other items of unreported income. Pittman was president and co-owner of BBL. The Tax Court also determined that Pittman was liable for additions to tax for fraud, 26 U.S.C. § 6653(b), and substantial understatement of tax, 26 U.S.C. § 6661.[1] In addition to challenging these determinations, Pittman contends that the Tax Court erred by according the presumption of correctness to the Commissioner of Internal Revenue's computation of corporate earnings and profits and by finding that the three-year statute of limitations under 26 U.S.C. § 6501(a) did not bar the Commissioner's 1992 assessment of taxes for taxable years 1986 and 1987. This Court has jurisdiction under 26 U.S.C. § 7482. For the reasons that follow, we affirm.[2]

## I. BACKGROUND

In late May 1991, agents of the Internal Revenue Service executed a warrant-authorized search of BBL's premises in Milwaukee, Wisconsin, seizing, among other things, its bank records, financial ledgers, and income tax returns. A statutory notice of deficiency was issued to Pittman on June 6, 1992,

---

1. All citations are to the Internal Revenue Code of 1986 which was in effect for the taxable years at issue. These sections are now found at 26 U.S.C. § 6663 and 6662, respectively.

2. On April 22, 1996, a panel of this Court affirmed Pittman's criminal convictions for, among other things, filing a materially false 1987 individual income tax return, 26 U.S.C. § 7206(1), and evasion of BBL's 1987 income tax by cashing checks paid to BBL for bus services or depositing such checks in accounts not belonging to BBL and not recording the receipt of those checks in BBL's books and records, 26 U.S.C. § 7201. *United States v. Pittman*, 82 F.3d 152 (7th Cir.1996). In response to questioning at oral argument here, the Commissioner took the position that, under familiar principles of issue preclusion, Pittman's criminal conviction would

estop relitigation of certain issues relating to his liability for 1987 income tax and additions thereto, *viz.*, whether he received income from diverted receipts and whether he understated his 1987 income with fraudulent intent. However, although the Commissioner correctly indicated in her brief that this Court could take judicial notice of its earlier opinion, she did not specifically argue that Pittman's conviction should be given preclusive effect. See Appellee's Br. at 10 n. 5. It is well-established in this Circuit that an argument raised for the first time at oral argument is waived for purposes of the appeal. See, *e.g.*, *United States v. Kezerle*, 99 F.3d 867 (7th Cir. 1996); *Sample v. Aldi*, 61 F.3d 544, 551 n. 1 (7th Cir.1995); *Quinn v. Neal*, 998 F.2d 526, 530 n. 4 (7th Cir.1993). Accordingly, we shall not consider the issue of preclusive effect of Pittman's conviction.

for the taxable years 1986 and 1987. The deficiency notice alleged that Pittman received the following income that had not been included on his income tax returns: (1) constructive dividends from BBL in the amounts of $67,241 and $79,036 for 1986 and 1987, respectively, based on the diversion of corporate receipts; (2) constructive dividends from BBL in the amount of $8,000 for the year 1987 based on the alleged personal use of corporate funds from BBL's Park State Bank account; (3) constructive dividends from BBL in the amounts of $3,896 and $2,924 for 1986 and 1987, respectively, based on BBL's payment of Pittman's personal expenses (primarily monthly mortgage payments); (4) checks paid to Pittman—and recorded in BBL's records as "Dividends"—in the amounts of $13,928 and $5,000 for 1986 and 1987, respectively; (5) imputed interest income in the amount of $5,439 for 1987 based on loans by Pittman to BBL; and (6) certain other dividend income from various investments totaling $28 for 1986 and $287 for 1987. The notice of deficiency also alleged that Pittman was liable for additions to tax for fraud and substantial understatement of income.

In response to the notice of deficiency, Pittman filed a timely petition with the United States Tax Court. The case proceeded to trial before that court on April 11 and 12, 1994. The Commissioner called one witness, IRS revenue agent Lynette Benham, who testified as to her analysis of BBL's books and records. Pittman called no witnesses. Instead, he simply attacked Benham's calculations and analysis of BBL's records during cross-examination. The following facts are drawn from the parties' joint stipulation of facts submitted to the Tax Court, as well as Benham's testimony and the trial exhibits:

Pittman was president and 50 percent shareholder of BBL during 1986 and 1987, the tax years in issue. Judith A. Boyd held the balance of the stock in BBL and served as its secretary-treasurer. Pittman incorporated BBL in 1979. From its inception in 1979 through 1987, BBL operated a school

bus service serving the Milwaukee metropolitan area. During 1986 and 1987, BBL provided busing services to the Milwaukee Public Schools ("MPS") and Heritage Christian Schools ("Heritage"), among others. Both school systems paid for BBL's busing services by checks. The checks from MPS, BBL's principal source of income totaled $667,015 in 1986 and $429,967 in 1987. The checks from Heritage totaled $67,241 in 1986 and $79,036 in 1987. As explained below, the checks from these two sources were handled quite differently.

BBL maintained two checking accounts at Bank One (formerly Marine Bank) and a third checking account at Park State Bank. Pittman maintained two personal savings accounts at Columbia Savings and Loan Association. BBL did not maintain any accounts at Columbia. During 1986 and 1987, BBL recorded the checks from MPS on ledger sheets labeled "Accounts Receivable" and deposited them into its checking account at Bank One. BBL treated the checks it received from MPS in 1984 and 1985 in the same manner. Consistent with its treatment of the MPS checks, BBL included the MPS checks as gross receipts on its corporate income tax returns for 1984 and 1985, and BBL included the checks as gross receipts on its prepared, but unfiled, corporate income tax returns for 1986 and 1987.[3] Indeed, the gross receipts reported on BBL's corporate tax returns for 1984 and 1985 matched within a few hundred dollars the receipts listed on BBL's accounts receivable ledgers. The gross receipts entry on BBL's 1987 prepared but unfiled tax return matches identically its accounts receivable ledger reflecting 1987 payments from MPS. The gross receipts entry on BBL's 1986 prepared but unfiled tax return differs from its 1986 accounts receivable ledger by $228.

The checks from Heritage were handled in a much different fashion. BBL did not deposit the Heritage checks into BBL's Bank One checking account and did not record them in its ledger along with the MPS en-

---

3. BBL did not file any corporate income tax returns for 1986 and 1987. Signed but unfiled copies of BBL's corporate returns for these years were discovered and seized by agents of the IRS Criminal Investigation Division in May 1991 during a warrant-authorized search of BBL's business premises in Milwaukee.

tries. Instead, Pittman endorsed all the checks from Heritage as "Bee Bus Line/ James A. Pittman" (or a variation thereof) and then either cashed or deposited[4] the checks at Columbia, where he maintained personal bank accounts.

During the relevant years, BBL received checks totaling thousands of dollars for busing services provided to a number of other schools and deposited these checks into its Park State Bank account. Like the Heritage checks, these checks were not reflected on BBL's books and records, and they were not reported as gross receipts on BBL's prepared but unfiled tax returns for 1986 and 1987. Also, checks drawn on BBL's Park State Bank account were not reflected in BBL's records nor on its prepared but unfiled returns for 1986 and 1987. In June 1987, BBL issued a check payable to Pittman in the amount of $7,000. The check was drawn by Pittman on behalf of BBL on its Park State Bank account. In November 1987, BBL issued a check payable to cash in the amount of $1,000. The check was drawn by Pittman on BBL's Park State Bank account. Pittman later endorsed the check and negotiated it at Columbia. In March 1987, Pittman drew a check on BBL's Park State Bank account in the amount of $500 payable to his personal Visa charge account with Bank Card Associates.

During 1986 and 1987, BBL made 20 separate mortgage payments of $269.37 on Pittman's personal residence.[5] Also during 1986 and 1987, BBL paid actual dividends to Pittman in the amount of $13,928 and $10,000, respectively. The dividends were paid by check from BBL's Bank One account. Boyd received like distributions on the same dates.

Pittman did not report any of the foregoing distributions (i.e., the Heritage checks, Park State Bank checks totaling $8,000, actu-

al dividends, personal expenses paid by BBL) as income on his individual tax returns for 1986 and 1987.[6] On June 26, 1992, the Commissioner issued a notice of deficiency to Pittman determining income tax deficiencies in the amounts of $35,488 and $32,818 for 1986 and 1987, respectively. Among other things not relevant here, the Commissioner determined that Pittman received but failed to report constructive dividends from BBL based upon: (1) his diversion of corporate receipts from Heritage in the amounts of $67,241 and $79,036 during 1986 and 1987, respectively; (2) his receipt of checks totaling $8,000 from BBL's Park State Bank account during 1987; and (3) BBL's payment of Pittman's personal expenses including mortgage payments in the amount of $2,963 in 1986 and $2,424 in 1987, as well as $933 in 1986 real estate taxes and a $500 Visa charge card payment in 1987. The Commissioner also determined that Pittman received but failed to report actual dividends from BBL in the amounts of $13,928 and $5,000 in 1986 and 1987, respectively. Last, the Commissioner determined that Pittman was liable for additions to tax for fraud and substantial understatement of income tax liability for these years. The Tax Court sustained the Commissioner's determinations in all material respects.

## II. ANALYSIS

The standards governing review of a decision by the Tax Court are the same as those governing review of district court determinations in a civil bench trial. 26 U.S.C § 7482(a); *Eyler v. Commissioner,* 88 F.3d 445, 448 (7th Cir.1996); *Fruit of the Loom, Inc. v. Commissioner,* 72 F.3d 1338, 1343 (7th Cir.1996). Questions of law are reviewed de novo; the Tax Court's factual determinations, as well as the application of

---

4. Heritage issued seven checks payable to BBL in 1986 totaling $67,241.17. All seven of these checks were cashed by Pittman at Columbia. In 1987, Heritage issued eight checks to BBL totaling $79,036.16. Pittman cashed seven of these checks at Columbia and deposited the eighth in a personal savings account he maintained there.

5. This Court's review of BBL's accounts payable ledger sheets for 1986 and 1987 reveals only 18 mortgage payments and the Commissioner's

brief only identifies 18 such payments. Appellee's Brief at 6. However, Pittman does not appear to challenge the Commissioner's determination that 20 payments were made totaling $5,387.

6. He did, however, report one 1987 actual dividend distribution from BBL in the amount of $5,000.

legal principles to those factual determinations, are reviewed only for clear error. *Eyler,* 88 F.3d at 448; *Fruit of the Loom,* 72 F.3d at 1343. "A finding of fact can be reversed as clearly erroneous only when the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Coleman v. Commissioner,* 16 F.3d 821, 825 (7th Cir. 1994) (internal quotation marks omitted); *Cline v. Commissioner,* 34 F.3d 480, 485 (7th Cir.1994). Moreover, "this court, in determining whether there is substantial evidence to support a finding of fact by the Tax Court, must view the evidence in the entire record in the light which is most favorable to the finding." *Tripp v. Commissioner,* 337 F.2d 432, 434 (7th Cir.1964).

The core of Pittman's appeal consists of three separate but related arguments all to the effect that the Tax Court erred in according the customary presumption of correctness to the Commissioner's determination that he received unreported income in the form of constructive dividends-principally from the Heritage receipts.[7] Pittman first argues that the Commissioner failed generally to establish that he diverted the proceeds from the Heritage checks to personal use. His second contention is merely a more refined version of the first, namely, that the Commissioner failed to establish that he personally benefitted from the Heritage receipts that he allegedly diverted from BBL. Finally, Pittman faults the Tax Court for according the presumption of correctness to the Commissioner's determination of BBL's earnings and profits. Because virtually the entirety of Pittman's appeal turns on the application of the presumption of correctness, we begin by briefly reviewing that familiar doctrine and then consider the foregoing arguments in turn.

 It has long been established in this Circuit that "the Commissioner's tax deficiency assessments are entitled to the 'presumption of correctness.' This presumption imposes upon the taxpayer the burden of proving that the assessment is erroneous."

*Gold Emporium, Inc. v. Commissioner,* 910 F.2d 1374, 1378 (7th Cir.1990); see also *Zuhone v. Commissioner,* 883 F.2d 1317, 1325 (7th Cir.1989); *Ruth v. United States,* 823 F.2d 1091, 1094 (7th Cir.1987); *F. & D. Rentals, Inc. v. Commissioner,* 365 F.2d 34, 40–41 (7th Cir.1966), certiorari denied, 385 U.S. 1004, 87 S.Ct. 707, 17 L.Ed.2d 543. The presumption is not irrebuttable however. As explained in *Ruth,* "[i]n certain quite limited circumstances ... courts recognize that an assessment should not be accorded even a rebuttable presumption of correctness. For example, when the assessment is shown to be 'without rational foundation' or 'arbitrary and erroneous,' the presumption should not be recognized.... As long as the procedures used and the evidence relied upon by the government to determine the assessment had a rational foundation, the inquiry focuses on the merits of the tax liability, not on IRS procedures." 823 F.2d at 1094 (citations omitted). Thus, to rebut the presumption of correctness and shift the burden to the Commissioner, the taxpayer must demonstrate that the Commissioner's deficiency assessment lacks a rational foundation or is arbitrary and excessive. *Id.;* see also *Gold Emporium,* 910 F.2d at 1378. As discussed below, courts commonly find this showing to be made when the Commissioner makes no evidentiary showing at all but simply rests on the presumption or when the Commissioner's evidence completely fails to link the taxpayer to alleged unreported income. Finally, it is important to bear in mind that "[t]he arbitrary and excessive doctrine is a challenge to the deficiency assessment itself on the basis that it bears no factual relationship to the taxpayer's liability, not a challenge to any proof offered by the Commissioner at trial before the Tax Court or district court." *Zuhone,* 883 F.2d at 1325. With these standards and principles in mind, we now consider Pittman's arguments.

 Pittman's first contention on appeal is that the Tax Court erred in determining that the payments received by BBL from Heritage in 1986 and 1987 were diverted by him

---

7. Indeed, because Pittman presented absolutely no affirmative evidence during the course of trial, he has no viable arguments that he satisfied

any burden of proof he might have and is therefore relegated to arguing that the presumption of correctness is inapplicable in his case.

to his personal use. This factual determination by the Tax Court is far from clearly erroneous. To the contrary, the finding is amply supported by the record. The uncontroverted evidence established that Pittman took the Heritage checks to Columbia Savings and Loan—where he, and not BBL, maintained accounts—and either cashed or deposited them. The evidence also revealed that the Heritage payments were not recorded or otherwise reflected on any of BBL's accounts receivable ledger sheets or other balance sheets. In short, there is not a shred of evidence that BBL ever received any of the value of the Heritage payments. In light of this substantive evidence linking Pittman to the Heritage payments and revealing that BBL received none of the value of those payments, the Commissioner clearly had a rational foundation for her determination that Pittman diverted the funds to personal use. Accordingly, the presumption of correctness properly attached to the Commissioner's determination and it was Pittman's burden to prove by a preponderance of the evidence that her determination was erroneous. See *Zuhone*, 883 F.2d at 1327; *Ruth v. United States*, 823 F.2d at 1093–1094 (7th Cir.1987).

■ Here Pittman relied solely on his cross-examination of the government's expert to sustain his burden, and that examination completely failed to undermine the Commissioner's factual foundation for her determination. Nothing in that cross-examination affirmatively demonstrated that the money from the Heritage checks remained within BBL's corporate dominion. At most, the cross-examination on this issue revealed that a book or folder (or perhaps both) labeled "Heritage" was included among the records seized from BBL by IRS criminal investigation agents and that the government's summary witness, revenue agent Benham, was not familiar with the contents of that book or folder. Pittman argues that absent a review by the Commissioner of these documents, the determination that Pittman diverted the Heritage funds was arbitrary and excessive and therefore the Commissioner bore the burden of proof on the issue. See *Zuhone*, 883 F.2d at 1327. Not so. Benham testified at length as to the fact that the BBL financial records

she reviewed, which included accounts receivable ledger sheets, balance sheets, and income statements, agreed (within a few hundred dollars) with BBL's corporate income tax returns for the years 1979 through 1985 as well as the prepared but unfiled returns for 1986 and 1987. She concluded quite reasonably that this agreement between the records and the returns indicated that these records were used to prepare BBL's returns. A reasonable inference from this testimony is that the financial records reviewed by Benham constituted the entirety of BBL's corporate financial records. As Benham put it, there was "no room" for any other corporate financial records given the close agreement between those records that were reviewed and the corporation's returns. When the evidence as a whole is viewed in the light most favorable to the Commissioner, the most reasonable inference from the fact that there was a separately maintained set of records for the Heritage receipts (if, in fact, that is what was contained in the book or folder—and Pittman made no affirmative showing on this point), is that Pittman was maintaining two sets of records in furtherance of his fraudulent under-reporting of income. See *Spies v. United States*, 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418 (listing the maintenance of a double set of books as an indication of fraud). Far from suggesting that the Commissioner's determination was arbitrary and excessive, this evidence is substantial evidence of his liability. The Tax Court's finding that the diverted Heritage receipts constituted a constructive dividend is a finding of fact that will not be set aside unless clearly erroneous. *Crowley v. Commissioner*, 962 F.2d 1077, 1080 (1st Cir.1992); *Hagaman v. Commissioner*, 958 F.2d 684, 690 (6th Cir.1992); *Loftin & Woodard, Inc. v. United States*, 577 F.2d 1206, 1215 (5th Cir.1978). And, again, the finding here is amply supported.

Pittman's second ground for arguing that the Tax Court erred in determining that the Heritage receipts he diverted were taxable to him as constructive dividends, is that in order to be treated as a constructive dividend, an alleged distribution must inure to the personal benefit of the taxpayer and the

Commissioner failed to demonstrate that Pittman enjoyed any such personal benefit. In this regard, he asserts that there was no evidence of any unusual expenditures by him or evidence of unexplained increases in his net worth. Accordingly, Pittman concludes that the Commissioner's deficiency assessment is not entitled to the presumption of correctness. As should be evident, this argument is simply a makeover of his first, adding as a twist a requirement that the Commissioner must demonstrate the taxpayer's benefit from the diverted funds before they can be considered a constructive dividend.

Pittman misapprehends the nature of the showing required to overcome the presumption of correctness here and mistakenly places the burden of proof on the Commissioner. In large measure, the foregoing analysis rejecting Pittman's first attack on the presumption also defeats the second. The evidence in this case linking Pittman to the Heritage checks is far more than a naked assertion by the Commissioner that he diverted the receipts. The evidence establishes that Pittman took the checks to his personal bank, not that of the corporation, and either cashed or deposited them. Moreover, there is no trace of the funds in the corporation's financial records. That evidence provided a rational foundation for the Commissioner to conclude that Pittman personally benefitted from the receipts and received a constructive dividend. At that point the burden was on Pittman to disprove this determination by a preponderance of the evidence. Because Pittman made no showing whatsoever that the Heritage receipts remained in corporate possession, the Tax Court reasonably concluded from the record as a whole that Pittman personally benefitted from the Heritage receipts and that they constituted a constructive dividend to him.

Furthermore, the cases cited by Pittman in support of his implicit assertion that the government must present evidence of unusual or lavish expenditures or unexplained increases in net worth in order to sustain a constructive dividend determination are all inapposite. In *Bard v. Commissioner*, 60 T.C.M. 485, 1990 WL 115204 (1990), the Tax Court expressly found that the revenue agents auditing the returns of the taxpayer and his corporation "found no indication of any diversion of corporate funds to [the taxpayer]." Thus in *Bard*, there was nothing but a bare and unsubstantiated charge of unreported income. That is a far different case than here where there is ample evidence of diversion. Similarly, in *Alisa v. Commissioner*, 35 T.C.M. 1113, 1976 WL 3439 (1976), the Tax Court credited the taxpayer's testimony that none of the cash maintained in a company file drawer was used for personal purposes except for what was reported on his own tax returns as income. Moreover, there the taxpayer's testimony was corroborated by the taxpayer's corporation's accountant. Such evidence is entirely absent here. In *Rosencrans v. Commissioner*, 13 T.C.M. 176, 1954 WL 555 (1954), the taxpayer withdrew $14,000 from the bank account of his corporation and held that money for safekeeping in his safety deposit box. A little over three years later, the corporation used all of the $14,000 that the taxpayer was holding to purchase real property. In light of the evidence that the taxpayer held all of the money in safekeeping for the corporation and returned the money to the corporation when needed, the Tax Court concluded that the taxpayer had not received a loan or dividend from the corporation. Pittman presented no evidence, let alone evidence suggesting that he was holding the Heritage receipts in safekeeping for BBL or that BBL had use of the funds when needed. Thus, none of these cases sheds any light on the controlling legal principles here. In one there was no evidence of diversion in the first place; in the other two the taxpayer submitted affirmative evidence to rebut the presumption of a constructive dividend. Here there is ample evidence of conversion and no affirmative contrary showing by Pittman.

Although there is language in these Tax Court decisions noting the absence of evidence of lavish expenditures or unexplained increases in net worth, the opinions do not purport to establish that such a showing is a necessary prerequisite for according the Commissioner's determination a presumption of correctness. Perhaps recognizing this shortcoming in his showing, Pittman points to several other unreported income cases in

which the court refused to accord the Commissioner's determination of unreported income the usual presumption of correctness, *Jackson v. Commissioner,* 73 T.C. 394, 1979 WL 3735 (1979); *Portillo v. Commissioner,* 932 F.2d 1128 (5th Cir.1991); *Weimerskirch v. Commissioner,* 596 F.2d 358 (9th Cir. 1979), and he urges us to do the same here. However, those cases also have no relevance to this case. As explained in the *Jackson* opinion, "on rare occasions ... in cases involving unreported income *where the respondent introduced no substantive evidence but rested on the presumption of correctness* and the petitioner challenged the notice of deficiency on the grounds that it was arbitrary," courts have declined to follow the general rule of not looking behind the notice of deficiency to examine the evidence used in making the determination. 73 T.C. at 401 (emphasis added). Thus in *Weimerskirch,* "[t]he Commissioner called no witnesses and introduced no evidence." 596 F.2d at 359. "In view of the total absence of any substantive evidence in the record which could support the Commissioner's deficiency determination," *id.* at 362, the Ninth Circuit reversed the judgment of the Tax Court, which had accorded the presumption of correctness to that determination.[8]

Similarly, in *Portillo,* the taxpayer was issued a deficiency notice determining that he had received unreported income. The deficiency determination was based on a $21,-380 discrepancy[9] between the gross receipts reported by the taxpayer on his income tax return and a Form 1099 filed by one of his employers indicating that he had paid the taxpayer $35,305 in the relevant tax year. The employer, however, could only account for $13,925 of the claimed payments and could produce no records supporting the remaining $21,380 in alleged payments, which

he claimed to have paid in cash. Thus the only basis for the Commissioner's deficiency determination was the employer's unsupported Form 1099. Under these circumstances, the Fifth Circuit concluded that the deficiency was based on nothing more than the naked assertion that the taxpayer had received unreported income, and that the Commissioner had arbitrarily decided to credit the employer rather than the taxpayer. 932 F.2d at 1134. Because the Commissioner had done nothing to substantiate the employer's claim of payment (such as examining his books, receipts, or other records) and had failed to substantiate by any other means his determination that the taxpayer had received the payment, the Court found that the Commissioner had merely chosen to rely upon the presumption of correctness and that in situations like this the presumption does not apply.

The Commissioner's case against Pittman stands on a much different footing than in *Weimerskirch* and *Portillo.* As has been emphasized repeatedly above, the evidence linking Pittman to the Heritage receipts is ample. The Commissioner's undisputed evidence—in fact it was stipulated to in the Tax Court (see Stipulation of Facts ¶¶ 19, 20)— established that Pittman took the Heritage checks and either cashed or deposited them at Columbia Savings and Loan where he held personal accounts and BBL held none.[10] Thus this is not a case like *Portillo* where there was no factual basis establishing that the taxpayer had received the subject income or like *Weimerskirch* where there was absolutely no evidence supporting the Commissioner's determination that the taxpayer had received unreported income. Rather the facts in this case clearly provide a rational foundation for the Commissioner's determination that Pittman received a constructive

---

**8.** The Commissioner had determined that Weimerskirch collected $30,000 in unreported income through the sale of heroin over a twenty-five week period. See 596 F.2d at 359 n. 1. However, no substantive evidence was admitted showing that Weimerskirch had unreported income from narcotic sales.

**9.** The actual discrepancy was $24,505. However, the taxpayer acknowledged that he had inadvertently failed to report $3,125 in income from

the employer. Thus only $21,380 of the deficiency was challenged by the taxpayer.

**10.** Pittman's repeated incantation that he endorsed the checks in his capacity as president of BBL is of no legal significance. The critical issue is not in what capacity Pittman negotiated the checks, but rather what became of the proceeds. And, the record is undisputed that those proceeds are reflected nowhere in BBL's financial books and records.

dividend in the form of the Heritage receipts and that determination was entitled to the presumption of correctness. Pittman bore the burden of proving by a preponderance of the evidence that he did not receive a constructive dividend. In light of his complete failure to satisfy his burden, the Tax Court correctly found that the Heritage receipts constituted a constructive dividend that was taxable to Pittman as ordinary income.

■ Pittman's final challenge to the Tax Court's constructive dividend determination lies in his contention that it erred by according the presumption of correctness to the Commissioner's calculation of BBL's earnings and profits for the relevant years. The significance of BBL's earnings and profits to the Commissioner's deficiency determination lies, of course, in the Internal Revenue Code's contrasting treatment of distributions to shareholders by a corporation "out of its earnings and profits" as opposed to distributions in excess of corporate earnings and profits. The former are treated as dividends that are taxable as ordinary income to the shareholder, see *Commissioner v. Gordon*, 391 U.S. 83, 88–89, 88 S.Ct. 1517, 1520–21, 20 L.Ed.2d 448, whereas the latter are generally treated either as return of capital (to the extent of the shareholder's basis in the corporation's securities) or as capital gain (to the extent that the distribution exceeded the shareholder's basis). See *Mazzocchi Bus Co. v. Commissioner*, 14 F.3d 923, 926 (3d Cir. 1994); *Truesdell v. Commissioner*, 89 T.C. 1280, 1294–1295, 1987 WL 258105 (1987). Pittman contends that the Commissioner made a number of mistakes in calculating BBL's earnings and profits [11] and therefore her determination should not be accorded the presumption of correctness.

■ Once again, Pittman seriously misconstrues the nature of the showing required to eviscerate the presumption of correctness. Cf. *Zuhone v. Commissioner*, 883 F.2d 1317, 1325 (7th Cir.1989) ("the taxpayer's argument, which presumes that the failure of the government to adhere to its promulgated procedures in calculating a tax deficiency necessarily results in an arbitrary and excessive deficiency notice, seriously misconstrues the inquiry required under the arbitrary and excessive doctrine"). All that is required to support the presumption is that the Commissioner's determination have some minimal factual predicate. It is only when the Commissioner's assessment is shown to be "without rational foundation" or "arbitrary and erroneous," that the presumption should not be recognized. *Ruth v. United States*, 823 F.2d 1091, 1094 (7th Cir.1987); see also *Zuhone*, 883 F.2d at 1325 (noting that the presumption may be rebutted in the case of a "naked" assessment—i.e., one that is "without rational foundation and excessive"). Pittman has failed to make such a showing, notwithstanding his claims of error by the Commissioner. It is significant that we have described the necessary showing as "arbitrary and erroneous," not just "erroneous." As the Eighth Circuit has observed in a related context, the Commissioner's "assessment is intended to be an estimate. It is expected to be rational not flawless." *Dodge v. Commissioner*, 981 F.2d 350, 353 (8th Cir. 1993), certiorari denied, 510 U.S. 812, 114 S.Ct. 58, 126 L.Ed.2d 28.

In the instant case, revenue agent Benham testified as to the Commissioner's computation—which Benham prepared for purposes of this case—of BBL's earnings and profits for the years at issue. Benham stated that she based her calculation of BBL's earnings and profits on figures contained in BBL's returns for 1979–1987 (including the prepared but unfiled returns for 1986 and 1987) as well as entries in BBL's books and records—making appropriate adjustments to reflect the Commissioner's deficiency determinations. Benham further stated that she used all the available information she had to

---

11. Most significantly, Pittman argues that under this Court's holding in *Demmon v. United States*, 321 F.2d 203 (7th Cir.1963), the Commissioner erred in computing BBL's earnings and profits by failing to incorporate any deductions from those earnings reflecting additional corporate income tax, additions to tax and interest attribut-
able to the diverted Heritage income that the Commissioner contends is taxable to BBL. Pittman also finds fault in the Commissioner's failure to deduct as dividends or expenses payments made by BBL to Judith Boyd in 1986 and 1987 from BBL's Park State Bank account.

calculate BBL's earnings and profits, and she acknowledged that "there [was] no way an absolutely correct earnings and profits could be determined without doing a complete audit of the corporation." She also testified that she had no knowledge of whether there had been an audit of the corporation or whether there was any proposed assessment of the corporation. Using what she characterized as "the most conservative method possible," [12] Benham calculated that after the adjustments in the deficiency notice, BBL had $32,334 in cumulative earnings and profits for 1986 and $31,756 for 1987.

On this record, we cannot conclude that the Commissioner's determination that BBL's earnings and profits were in excess of the constructive dividends allegedly received by Pittman is so arbitrary or lacking in any factual foundation as to defeat the presumption of correctness. While Pittman faults the Commissioner for failing to deduct from earnings and profits amounts reflecting additional corporate income tax, additions to tax and interest, Benham's undisputed evidence was that she was aware of no audit or proposed assessment of the corporation. Nor do we think it was incumbent upon the Commissioner to conduct such a complete audit. For purposes of determining Pittman's tax liability, the Commissioner was not required to calculate an absolutely precise measure of BBL's earnings and profits; rather, she merely needed to determine, based on some minimal factual foundation, that BBL had sufficient earnings and profits out of which to pay Pittman the constructive dividends he was shown to have received. The Commissioner did so and at that point it was Pittman's burden to demonstrate that the she was wrong. Thus Pittman's arguments that the Commissioner made various errors in calculating BBL's earnings and profits may be relevant to his ultimate showing on the

merits but they fall far short of rebutting the presumption of correctness.

■ With respect to meeting his burden, Pittman hasn't a leg to stand on. He apparently gambled on his belief that the Commissioner's determination was without any rational foundation and rested without calling any witnesses. Pittman named IRS special agent Diane S. Taggert on his list of expected witnesses, and during the course of trial Pittman's counsel stated to the court: "One of the witnesses we have on our list is one of the special agents—we have Ms. Taggart [sic], the cooperating revenue agent—and we are going to ask them whether or not they did an audit; we are going to ask them whether there is a preprosecution report; we are going to ask whether or not there was an audit of the corporation, if they intend to assess a tax, because I think all that goes to earnings and profits." Pittman also named as a witness James Mohr, a certified public accountant from KMPG Peat Marwick. Pittman's trial memorandum states, "Mr. Mohr will testify, if necessary, with respect to the computation of the amount of the earnings and profits of Bee Bus Lines, Inc., if any, that were available for distribution of taxable dividends during 1986 and 1987." Neither of these witnesses was called. Thus Pittman adduced no evidence whatsoever during the trial that BBL's earning and profits were insufficient to support the constructive dividends he received. Accordingly, the Tax Court did not clearly err in finding that Pittman received constructive dividends in the amounts determined by the Commissioner and the Tax Court's finding in this regard will not be disturbed.

■ Our conclusion that the Tax Court correctly determined that Pittman received constructive dividends amounting to at least $67,241 in 1986 and $79,036 in 1987 (the amount of the Heritage receipts) dooms his

---

**12.** For instance, Benham testified that in calculating BBL's earnings and profits, she utilized the depreciation method that BBL had previously used in preparing its returns despite the fact that BBL had used an accelerated method of depreciation (which was more advantageous to BBL) rather than the straight-line method as required by § 316 of the Internal Revenue Code. In this regard, Benham testified that she did the

computation using the straight-line depreciation method "but it was such a difference and created so much less depreciation expense that it was felt we didn't even need to include that additional computation in our earnings and profits." Also, Benham testified that in computing BBL's earnings and profits, she did not include the receipts deposited into BBL's Park State Bank account.

contention that the general three-year statute of limitations provided by 26 U.S.C. § 6501(a) bars the Commissioner's June 6, 1992 assessment of deficiencies for 1986 and 1987. Section 6501(e) of the Internal Revenue Code extends the limitations period to six years for cases involving substantial omission of income. Specifically, if a taxpayer omits from gross income an amount greater than 25 percent of the gross income actually reported on his return, the tax may be assessed at any time within six years after the return was filed. 26 U.S.C. § 6501(e)(1)(A). Pittman reported gross income in the amounts of $21,032.07 and $16,047.22, respectively, on his 1986 and 1987 personal income tax returns. Plainly, it is clear from the Heritage receipts alone—leaving aside the additional 1986 and 1987 distributions from BBL (totaling thousands of dollars) that Pittman received and failed to report—that he omitted amounts in excess of 25 percent of the gross income he actually reported on his 1986 and 1987 returns. Accordingly, § 6501(e)(1)(A)'s six-year period of limitations applies and the Commissioner's assessments were timely.[13]

 Pittman's final contention is that the Tax Court erred in finding him liable for additions to tax for fraud under 26 U.S.C. § 6653(b). The contention is meritless. A finding of fraud by the Tax Court is a finding of fact that will not be set aside unless clearly erroneous. It is the Commissioner's burden to prove fraud by clear and convincing evidence. *Plunkett v. Commissioner*, 465 F.2d 299, 303 (7th Cir.1972); *Estate of Upshaw v. Commissioner*, 416 F.2d 737, 741 (7th Cir.1969), certiorari denied, 397 U.S. 962, 90 S.Ct. 993, 25 L.Ed.2d 254; *Steiner v. Commissioner*, 350 F.2d 217, 220 (7th Cir. 1965). Once the Commissioner establishes

that any portion of an underpayment is attributable to fraud, "the entire underpayment shall be treated as attributable to fraud, except with respect to any portion of the underpayment which the taxpayer establishes as not attributable to fraud." 26 U.S.C. § 6653(b).

 To establish fraud, the Commissioner must prove that the taxpayer intended to evade taxes that he knew or believed were owed. *Granado v. Commissioner*, 792 F.2d 91, 93–94 (7th Cir.1986), certiorari denied, 480 U.S. 920, 107 S.Ct. 1378, 94 L.Ed.2d 692. Because tax evaders do not reveal their fraudulent evasion, the Commissioner may establish fraud through circumstantial evidence. *Plunkett*, 465 F.2d at 303; *United States v. Walton*, 909 F.2d 915, 926 (6th Cir.1990). In *Spies v. United States*, the Supreme Court set out a non-exhaustive set of indicia of fraud: "we would think affirmative willful attempt [to defeat and evade taxes] may be inferred from conduct such as keeping a double set of books, making false entries or alterations, or false invoices or documents, destruction of books or records, concealment of assets or covering up sources of income, handling of one's affairs to avoid making the records usual in transactions of the kind, and any conduct, the likely effect of which would be to mislead or to conceal." 317 U.S. 492, 499, 63 S.Ct. 364, 368, 87 L.Ed. 418; see also *Bradford v. Commissioner*, 796 F.2d 303, 307–308 (9th Cir.1986) (listing badges of fraud and collecting cases).

The Tax Court's opinion carefully and thoroughly set out the evidence of fraud in this case and that effort need not be fully repeated. In brief, there was clear and convincing evidence of fraud on Pittman's part

---

13. Alternatively, the fraud exception to the general three-year statute of limitations also applies in this case. Section 6501(c)(1) of the Internal Revenue Code provides an unlimited period of assessment for any year in which a taxpayer filed "a false or fraudulent return with the intent to evade tax." In connection with its determination that Pittman was liable for the fraud penalty provided for by 26 U.S.C. § 6653(b), the Tax Court necessarily determined that some part of Pittman's tax underpayment in each of the relevant years was attributable to fraud. As discussed more fully below, the Tax Court's deter-

mination that Pittman fraudulently underpaid his 1986 and 1987 taxes is not clearly erroneous. Where the fraud penalty under section 6653(b) applies, section 6501(c)(1)'s false return exception to the general three-year statute of limitations also applies. See *Considine v. United States*, 683 F.2d 1285, 1288 (9th Cir.1982); *Lee v. United States*, 466 F.2d 11, 14 (5th Cir.1972); *Asphalt Indus., Inc. v. Commissioner*, 384 F.2d 229, 232 (3d Cir.1967). Thus under this alternative rationale the Commissioner's assessments were timely.

in connection with his diversion of the 1986 and 1987 Heritage receipts, including the following: First, Pittman significantly and repeatedly understated his income by not reporting the amounts he diverted to his personal use from Heritage. Additionally, he attempted to conceal this income by cashing the checks from Heritage, purportedly on behalf of BBL, at a bank where BBL maintained no accounts, and he failed to ensure, as president of BBL, that the Heritage proceeds were properly recorded in BBL's books and records. Furthermore, the fact that Pittman cashed the checks rather than depositing them into an account suggests that he was further attempting to conceal the existence of the income by leaving no trail of unexplained accumulations of funds in his account, and presumably by conducting his subsequent dealings in cash. Finally, the evidence indicates that Pittman either kept no records of the Heritage receipts or, if he did, he maintained those records separate and apart from BBL's regularly maintained financial books and records. Either of these interpretations of the record supports the inference of fraud. In sum, the contrast between Pittman's handling of the Heritage checks and how payments from MPS were handled (i.e., duly recorded in BBL's financial books, deposited into BBL's corporate account, and reported as gross receipts on BBL's corporate returns) is completely unexplained and fully supports the inference of fraud. Based on the foregoing, the Tax Court concluded that "[t]hrough this scheme, [Pittman] actively attempted to avoid taxation of this income, both at the corporate and individual levels." There is no clear error in this determination; to the contrary, it is well supported.

For the foregoing reasons, the judgment of the Tax Court is affirmed in all respects.

AFFIRMED.