# In the
# United States Court of Appeals
## For the Seventh Circuit

No. 04-2981

NICK KIKALOS and HELEN KIKALOS,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 11486-01—**Joel Gerber,** *Judge*.

ARGUED APRIL 7, 2005—DECIDED JANUARY 19, 2006

Before MANION, ROVNER and SYKES, *Circuit Judges*.

ROVNER, *Circuit Judge.* The Internal Revenue Service audited the 1997 tax return of Nick and Helen Kikalos and found that they underreported their income and thus owed more tax than they had paid. The IRS also assessed an accuracy-related penalty against the pair in the amount equal to twenty percent of the underpayment. The couple petitioned the United States Tax Court for a redetermination of the deficiency and after a two-day hearing, the court sustained both the deficiency and the penalty. Nick and Helen Kikalos appeal and we affirm.

**I.**

In 1997, the tax year at issue, Nick and Helen Kikalos owned four liquor stores in Hammond, Indiana. The stores, operating under the name "Nick's Liquor Mart," sold beer, wine, liquor and cigarettes, among other things.[1] These family-run ventures were sole proprietorships, with daughter Elizabeth managing one of the stores. Elizabeth and her brother, Nick Jr., together owned a fifth store called "Nick's Cigarette City." At the time of this audit, Nick and Helen Kikalos (we will call them the taxpayers for shorthand) were no strangers to the IRS, having been audited every year from 1986 through 1993. A recurring theme in these audits had been the IRS's displeasure with the taxpayers' record-keeping. In 1995, at the conclusion of the audits for tax years 1990, 1991 and 1992, the IRS and the taxpayers executed an "Agreement to Maintain Adequate Books and Records," which specified certain records for the taxpayers to keep in the future. The agreed-upon records included daily cash register tapes and daily cash reconciliations. The daily cash reconciliations were to include the amount of cash which was withdrawn from the business for whatever purpose, the amount of cash available for bank deposits, and a record of the amount, date and type of draw being withdrawn from the business. The 1997 audit was triggered in part when the Mercantile National Bank contacted the IRS to report unusual financial activity by Nick Kikalos.[2] Kikalos had purchased thirty-one cashier's checks from the Mercantile National Bank in 1997 in an amount totaling $809,734.51. Kikalos used cash and third-party checks to purchase the checks.

---

[1]  We will refer to the four stores collectively as "Nick's Liquor."

[2]  For the remainder of the opinion, when we refer to "Kikalos" in the singular, we are referring to Nick Kikalos, Sr.

The audit ultimately focused on the cigarette aspect of the taxpayers' stores. Nick's Liquor participated in cigarette company programs called "buydowns." A buydown is a discount a cigarette manufacturer provides to a retail outlet for each pack or carton of cigarettes sold during a certain time period. The manufacturers give the discount directly to the retailer with the expectation that the retailer will then pass on the savings to the ultimate consumer. There are no coupons involved in buydown programs. Rather, the cashier at the point of sale must be aware of the buydown programs for particular brands of cigarettes and ring up the sale accordingly. At Nick's Liquor, the store managers were responsible for informing the cashiers about the cigarette brands on buydown at any particular time. Some cigarette companies attempted to verify that retailers were passing the discounts on to their customers by checking the prices displayed in the retailers' windows. Manufacturers also asked retailers to take inventory at the beginning and end of a buydown period to verify the amount of buydown reimbursement a retailer should receive. Nick's Liquor conducted its own inventories that were not audited or verified by the cigarette companies.

After the close of a buydown period, Nick's Liquor would submit a request for reimbursement to the manufacturer sponsoring the program, and the manufacturer would then issue a check based on the number of cartons purchased during the buydown period multiplied by the discount per carton. The delay between the request for reimbursement and issuance of a check would sometimes be as long as two months. Because of this delay, some checks received in early 1997 were due to sales made in 1996 and some payments for 1997 buydown sales were not received until early 1998. In addition to buydowns, Nick's Liquor honored manufacturers' paper coupons. Cigarette companies reimbursed Nick's Liquor for the face value of submitted coupons plus postage costs. For the sake of simplicity,

we will use the term "buydown" to include both buydown and coupon income, unless otherwise indicated.

According to the IRS, Nick's Liquor received substantial payments from cigarette companies in 1997 that were not deposited to the stores' business bank accounts, were not reported to the stores' accountant and consequently were not disclosed on the couple's 1997 tax return. Instead of recording this income through normal channels, Kikalos took more than $500,000 worth of buydown reimbursement checks, combined them with other third party checks and used them to purchase more than $800,000 worth of cashier's checks from the Mercantile National Bank. After the bank contacted the IRS, a revenue agent commenced an audit and attempted to determine whether these cashier's checks represented unreported income. The taxpayers and their accountant provided a number of records to the revenue agent, including spreadsheets that purported to document cigarette buydown income. The spreadsheets contained many different and conflicting numbers for this type of income so the revenue agent selected the largest figure given in any spreadsheet, $777,848, and used that as the baseline figure for buydown income. The taxpayers had reported $653,164 of buydown income on their 1997 return, leading the revenue agent to conclude that the taxpayers had underreported their income by $124,684. The agent issued a deficiency notice for the amount of tax due on this additional income, and also imposed an accuracy-related penalty equal to twenty percent of the underpayment pursuant to 26 U.S.C. § 6662(a).

The taxpayers petitioned the Tax Court for a redetermination of the deficiency. After a two-day hearing, the court determined that the taxpayers had in fact underreported their income by $242,666, nearly twice the agent's determination. The court therefore upheld the IRS's deficiency notice as well as the penalty. In reaching this

result, the court took a different evidentiary path than the revenue agent. The court noted that three of the four spreadsheets provided by the taxpayers reflected $521,695 in buydown income but the fourth indicated $777,848. The court found that, despite requests from the revenue agent, the taxpayers failed to furnish adequate records to substantiate the amount of buydown income recorded by each of the four stores on a daily, monthly or annual basis. Nor did the taxpayers provide records to reconcile cigarette company reimbursement payments with the amounts reported as buydown income. The court noted the unusual purchase of thirty-one cashier's checks, which Kikalos accomplished by using buydown reimbursement checks, other third-party checks, and cash in amounts less than $10,000 to avoid IRS reporting requirements. Kikalos did not tell his accountant about these cashier's checks and he did not record the receipt of the third party checks in the accounting records for Nick's Liquors. All in all, Kikalos converted $531,605 of buydown reimbursement checks into cashier's checks. The court remarked that Kikalos admitted in his testimony that one of his objectives in purchasing the cashier's checks with third-party checks rather than cash was to avoid reporting cash transactions exceeding $10,000 to the IRS. The court found significant the taxpayers' failure to demonstrate that the third-party checks used to purchase the cashier's checks were included in gross business income. Moreover, the accountant for Nick's Liquor testified that she was unaware of the existence of the cashier's checks. The accountant verified that the only entry in the 1997 for cigarette company checks was the $400,746 entry in October. She could not recall what documentation she was given to support this entry but said, "I would imagine it was checks." Tr. at 236. She said the basis for the amount of the entry was "[p]robably a deposit appearing in the bank, but I couldn't say for sure." *Id*. She then clarified that although she could not recall the documentation exactly, she believed it was a deposit slip. *Id*. The taxpayers did not produce

credible evidence that the cigarette company checks used to purchase the cashier's checks were part of this October 1997 entry.

From these facts, the court concluded that Kikalos had not reported $531,605 in buydown checks that had been used to purchase cashier's checks. The accountant for Nick's Liquor had noted $400,746 in buydown income in the October 1997 records for the stores. The court added those two figures for a total of $932,352. The court then adjusted to exclude 1996 buydown income that was received in 1997 (a $73,392 subtraction), and to include 1997 income that was not received until 1998 (a $100,810 addition). The IRS conceded that it had double-counted $63,940 in "rack and promotional" income from cigarette companies, so the court excluded that amount as well. All in all, the court calculated $895,830 in buydown income. Kikalos and his wife reported $653,164 in buydown income on their 1997 tax return, and the court concluded that unreported buydown income equaled $242,666. Although this figure was nearly double the amount originally claimed by the IRS, the government did not seek an increased deficiency. Because Kikalos did not have adequate records to challenge this calculation, the court upheld the original deficiency. The court also upheld the accuracy-related penalties imposed by the IRS under section 6662. That section allows a 20% penalty on any understatement of tax attributable to negligence or disregard of the rules and regulations, or any substantial understatement of income tax. The court found that Kikalos violated this section when he failed to keep adequate books or records after repeatedly being warned by the IRS to do so. The court again noted Kikalos's testimony that his practice of purchasing cashier's checks was designed in part to conceal large cash transactions from the government. These two factors justified the accuracy-related penalty, according to the court. The taxpayers appeal.

**II.**

On appeal, Kikalos and his wife raise three issues. First, they assert that the Tax Court impermissibly allowed the IRS to introduce a new theory of unreported income in its post-trial brief. Second, they contend that the Tax Court then clearly erred in accepting that post-trial theory that the couple received $890,055[3] in buydown income in 1997. Finally, the taxpayers maintain that the Tax Court clearly erred in imposing a negligence penalty against them. In reviewing decisions of the Tax Court, we assess questions of law *de novo*, and review factual determinations for clear error. *Estate of Kunze v. Commissioner*, 233 F.3d 948, 950 (7th Cir. 2000); *Kikalos v. Commissioner*, 190 F.3d 791, 793 (7th Cir. 1999). Moreover, we review applications of law to the facts for clear error. *Kunze*, 233 F.3d at 948; *Kikalos*, 190 F.3d at 793; *Pittman v. Commissioner*, 100 F.3d 1308, 1312-13 (7th Cir. 1996). We will reverse findings of fact for clear error only when, on reviewing the entire record, we are left with the definite and firm conviction that a mistake has been committed. *Pittman*, 100 F.3d at 1313.

**A.**

The taxpayers complain that the Tax Court improperly allowed the IRS to change its theory and method of proof in its post-trial brief and then embraced this new theory in its decision. According to the taxpayers, the government's original theory was that a spreadsheet produced by the taxpayer showed $777,848 in buydown income but their

---

[3] Although the number quoted in the taxpayers' brief differs slightly from the amount found by the Tax Court, the difference does not affect the outcome of the appeal. In the end, the government did not seek to recover taxes on the amount proved at the hearing but limited its claim to the amount stated in the original deficiency notice.

1997 tax return reported only $653,164 of buydown income, a difference of some $124,684. In its post-trial brief, the government suggested a different method of calculating the shortage, this time noting that the taxpayers' accountant recorded $400,746 in buydown income in October 1997, and bank records showed that Kikalos had purchased cashier's checks using $531,605 in buydown checks. Because the accountant testified she was unaware of the purchase of the cashier's checks and because Kikalos did not produce sufficient records to demonstrate that he had reported any of that $531,605 on his 1997 return, the government urged the Tax Court to add these figures together for a baseline of buydown income. After adjustments, and after subtracting the amount of buydown income the taxpayers did report on their 1997 return, the Tax Court adopted this new calculation and found that they underreported buydown income in the amount of $242,666. Because this amount was nearly double the shortage the IRS sought to prove, the Tax Court upheld the deficiency notice. The taxpayers urge us to find that this change in the calculation of the shortage constituted "a whole new method of proof and theory" that came too late in the proceedings. The taxpayers assert that because the IRS raised these "new positions" in amended pleadings, the burden of proof, normally borne by the taxpayers-petitioners at this stage of the proceedings, should have been shifted to the IRS. The taxpayers also maintain that allowing these new theories so late in the case prejudiced them and constituted reversible error.

Deficiencies determined by the Commissioner of Internal Revenue are presumed to be correct and the taxpayer bears the burden of proving otherwise. Tax Court Rule 142(a); *Reynolds v. Commissioner*, 296 F.3d 607, 612 (7th Cir. 2002); *Pittman*, 100 F.3d at 1313; *Zuhone v. Commissioner*, 883 F.2d 1317, 1323 (7th Cir. 1989). However, Tax Court Rule 142 also specifies that with respect to "any new matter, increases in deficiency, and affirmative defenses, pleaded in the answer" the burden of proof is on the

Commissioner. Tax Court Rule 142(a); *Friedman v. Commissioner*, 216 F.3d 537, 543 (6th Cir. 2000). The government did not seek an increase in the deficiency and affirmative defenses are not at issue; thus the only dispute is whether the IRS raised a "new matter" in its post-trial brief when it suggested a different calculation for the buydown income shortage. This is not a close call. The change in the method of calculation of the buydown income is not a "new matter." A new position taken by the IRS Commissioner is not a "new matter" if it "merely clarifies or develops [the] Commissioner's original determination without requiring the presentation of different evidence, being inconsistent with [the] Commissioner's original determination, or increasing the amount of the deficiency." *Friedman*, 216 F.3d at 543. *See also Estate of Kanter v. Commissioner*, 337 F.3d 833, 851 (7th Cir. 2003), *rev'd on other grounds*, 125 S. Ct. 1270 (2005).

In *Kanter*, we stated:

> The Commissioner is allowed the latitude to amend his pleadings and even adopt entirely new *theories* supporting assessed deficiencies without triggering Rule 142's shift in burden, so long as the new theory is not inconsistent with the original allegation, does not require new evidence in its support, nor increases the amount of the deficiency.

*Kanter*, 337 F.3d at 851 (emphasis in original). The original deficiency notice specified that the taxpayers failed to report "coupon buy downs" in the amount of $124,684. R. 1, Ex. A-1. Another exhibit in the deficiency notice further detailed the shortage in a paragraph entitled "Statement Regarding Adjustment for Coupon Buy Downs":

> It is determined that all coupon income was not included in gross income. Coupon income shown on each store's general ledger data input sheet was totaled and compared to checks received and to your accountant's

summary of total coupon money. This comparison revealed additional income of $124,684.00 and an adjustment is made accordingly.

R. 1, Ex. A-4. The calculation raised in the post-trial brief and largely adopted by the Tax Court was completely consistent with the original deficiency notice. Both the notice and the post-trial brief sought to document unreported coupon and buydown income and both noted the difference between the accountant's records and the buydown reimbursement checks received. No new evidence was required to conduct this new calculation. Finally, although the new calculation demonstrated an even greater shortage than the deficiency notice specified, the government agreed to limit its recovery to the amount detailed in the original deficiency notice. The taxpayers were clearly on notice that the IRS was examining buydown income in general and the difference between income reported to their accountant and total checks received. Because this was not a new matter, the burden remained on the taxpayers to demonstrate that the Commissioner's deficiency determination was incorrect.

**B.**

Now that we have determined that the burden was on the taxpayers to demonstrate error in the deficiency determination, we turn to whether the taxpayers met this burden. According to the taxpayers, the theory adopted by the Tax Court relies on factors not supported by the evidence. In particular, the taxpayers claim that the court erroneously assumed they had a secret bank account, and also wrongly assumed that there was no overlap between the $400,746 in buydown income recorded by their accountant on October 31, 1997, and the $531,606 in buydown checks that Kikalos used to purchase cashier's checks. The taxpayers complain that the Tax Court erroneously manipulated the evidence

regarding transactions near the end of the prior year and the beginning of the subsequent year. Much of the taxpayers' brief is devoted to attacks on the methodology and credibility of the revenue agent who conducted the audit. Aside from the fact that nothing in the record undermines the credibility of the agent, we need not address these arguments because the Tax Court did not, in the end, rely on the agent's original calculations in upholding the deficiency. We will therefore address only those arguments that relate to the Tax Court's ultimate determination.

As we noted earlier, deficiencies determined by the Commissioner are presumed to be correct and the taxpayer bears the burden of proving otherwise. Tax Court Rule 142(a); *Reynolds,* 296 F.3d at 612; *Pittman,* 100 F.3d at 1313; *Zuhone,* 883 F.2d at 1323. The IRS explained that buydown income was recorded in the monthly general ledgers for Nick's Liquors under an accounting category titled "Cigarette Company Checks." The accountant for Nick's Liquors made a single entry in the books for this account in 1997, an October 31 entry for $400,746. The IRS noted that Nick's Liquors received a substantial number of reimbursement checks from cigarette companies before and after that date in 1997, and that these checks were not deposited to the stores' business bank account and were not reported to the stores' accountant. Moreover, Kikalos converted more than $500,000 worth of cigarette company reimbursement checks into cashier's checks without ever telling the stores' accountant about the receipt of the reimbursement checks. The court therefore added together the amount listed in the accountant's ledger and the amount used to purchase cashier's checks. Using the approximately two-month delay between the time of cigarette sales and receipt of a reimbursement check, the court adjusted this amount to exclude payments received in 1997 for 1996 sales and to include payments for 1997 not received until 1998. The court further reduced the total by

$63,940 because the evidence showed that this amount had already been included in another category of cigarette company income for promotional payments. The resulting amount, $895,830, exceeded the amount reported on the 1997 tax return by $242,666.

This amount more than justified the Tax Court's decision to uphold the deficiency notice in the amount of $124,684. The IRS points out that the taxpayers have produced no records to demonstrate the claimed overlap between the $400,746 accounting entry and the $531,605 used to purchase cashier's checks. During cross-examination by Ronald Jordan, District Counsel for the IRS, Kikalos testified that he purposely tried to avoid the attention of the IRS when he purchased the cashier's checks with third-party checks:

> Mr. Jordan: You didn't take the check to the store, you took cash to the store and gave the store cash for the check.
>
> Mr. Kikalos: That is correct.
>
> Mr. Jordan: My question to you is why did you go through this process, why didn't you just take the check to the store, let them ring the check up and deposit the check with their daily receipts?
>
> Mr. Kikalos: I wouldn't have been able to use the check to purchase certified checks.
>
> Mr. Jordan: Why didn't you just take the cash that you had that you could have given to the store and purchase the cashier's check?
>
> Mr. Kikalos: Because I was afraid of the IRS. If you take $10,000, you have to fill out a what-do-you-call? I'm buying $50,000 checks, not in cash but I mean—

Mr. Jordan:   You were afraid that the IRS would find out about your purchase of cashier's checks?

Mr. Kikalos:   They've been known to talk to me a few times.

Tr. at 207. Kikalos then explained that he did not keep records of the buydown checks he received because the checks did not represent income. Rather, they were reimbursements for discounts given to the consumer at the point of sale, a complete pass-through with no income to the stores. Tr. at 208. Kikalos, however, did not produce at the hearing the daily cash register tapes that would have demonstrated that the store actually passed the discounts onto the consumers and recorded the transaction at the point of sale.[4] The taxpayers seem to be under the impression that it was the burden of the IRS to examine the daily register tapes to verify Kikalos' version of the stores' accounting practices. The taxpayers also maintain that the IRS was obliged to demonstrate that the there was no overlap between the buydown checks recorded by the stores' accountant in October 1997 and the buydown checks that Kikalos used to purchase cashier's checks.

It is difficult to parse through Kikalos' theory given the state of the record. The hearing raised many questions for which Kikalos provided no answers. For example, Kikalos did not consider buydown reimbursements to be

---

[4] He produced two days' worth of cash register tapes from one of the four stores to demonstrate that discounts were made at the time of the sale. According to the taxpayers, the register tapes for 1997 were approximately forty-six miles long and there was "no point in submitting this mountain of paper as it could not disprove the basic premise underlying the government's position: that appellants were cheating customers and cigarette manufacturers." Petitioners-Appellants' Reply Brief, at 10.

income but the accountant for Nick's Liquors recorded $400,746 of buydown income in the stores' ledger in October 1997. Kikalos himself reported $653,164 in buydown income on his 1997 tax return, which is puzzling if none of the buydown checks should have been included in gross income. We are also left to wonder why Kikalos did not tell his accountant about more than $500,000 in reimbursement checks, information she certainly needed to reconcile the stores' books. And finally, we question why Kikalos converted so many of the buydown checks to cashier's checks without his accountant's knowledge and in a manner he specifically designed to avoid the attention of the IRS. As we stated above, the Commissioner's determination of the amount of unreported buydown income is presumptively correct and the taxpayers have the burden of proving otherwise. *Pittman*, 100 F.3d at 1313; *Zuhone*, 883 F.2d at 1323. "As long as the procedures used and the evidence relied upon by the government to determine the assessment had a rational foundation, the inquiry focuses on the merits of the tax liability, not on IRS procedures." *Pittman*, 100 F.3d at 1313. To rebut the presumption of correctness and shift the burden to the Commissioner, the taxpayers must demonstrate that the Commissioner's deficiency assessment lacks a rational foundation or is arbitrary and excessive. *Pittman*, 100 F.3d at 1313. "All that is required to support the presumption is that the Commissioner's determination have some minimal factual predicate." *Pittman*, 100 F.3d at 1317. The Commissioner easily meets the standard here. The Commissioner demonstrated that the taxpayer's accountant recorded $400,746 in buydown income in October 1997, that the taxpayer purchased cashier's checks using more than $500,000 in buydown reimbursement checks, that no records show an overlap between these two amounts and that the taxpayers avoided giving their accountant full information about these reimbursement checks while seeking also to avoid the attention of the IRS. Moreover, the IRS presented evidence supporting the

adjustments made for the typical eight-week delay involved in processing requests for buydown reimbursement. That is a sufficient and rational factual basis for the government's deficiency calculation. *See Zuhone*, 883 F.2d at 1326 ("The Commissioner may use any reasonable method of calculation where, as in this case, the taxpayer fails to produce or maintain adequate records from which actual income may be ascertained.") Kikalos has not produced evidence to show that there was an overlap as he argues on appeal, or that the reimbursement checks were not income at all because the discounts were passed on to consumers at the point of sale as shown in daily register tapes. *See Lerch v. Commissioner*, 877 F.2d 624, 631 (7th Cir. 1989) (the determination of whether a specific item of income was reported on a given tax return is a fact question; the taxpayer bears the burden of proving in Tax Court that an item of income has been included in a tax return). Kikalos produced two register tapes and gave testimony and other evidence that the Tax Court simply did not believe. *See Frierdich v. Commissioner*, 925 F.2d 180, 185 (7th Cir. 1991) (the statements of an interested party as to his own intentions are not necessarily conclusive even when they are uncontradicted). We see no reason to rebut the presumption of correctness granted to the Commissioner in these circumstances. There is no clear error in the Tax Court's determination regarding the existence or the amount of the deficiency. *See Reynolds*, 296 F.3d at 613. We therefore uphold the Commissioner's deficiency determination and affirm the ruling of the Tax Court.

## C.

The last issue is the propriety of the penalty that the IRS imposed on Kikalos and his wife under 26 U.S.C. § 6662(a). Section 6662(a) provides that a twenty percent penalty is

imposed on any underpayment of tax attributable to, among other things, the taxpayer's negligence or disregard of the rules and regulations, or any substantial understatement of tax. Section 6662(c) defines negligence to include failure to make a reasonable attempt to comply with the Internal Revenue Code. The term "disregard" includes "any careless, reckless, or intentional disregard." 26 U.S.C. § 6662(c). In its deficiency notice, the IRS stated that it had determined that the entire underpayment of taxes in this case was attributable to negligence or disregard of the rules and regulations of the Internal Revenue Code and thus the IRS imposed a twenty percent penalty on the amount owed. Pursuant to Section 7491(c), the Commissioner bears the burden of production in any court proceeding with respect to liability for any penalties imposed. 26 U.S.C. § 7491(c). The Tax Court found that the Commissioner met that burden by demonstrating that the taxpayers failed to keep adequate books and records to substantiate the items in questions. *See Reynolds*, 296 F.3d at 618 (negligence includes any failure by the taxpayer to keep adequate books and records). According to the Tax Court, Kikalos failed to maintain adequate records even though he had been repeatedly warned by the IRS to do so. The Tax Court noted that it had previously found the taxpayers' records inadequate for 1990, 1991 and 1992. In June 1995, the taxpayers signed a record retention agreement with the IRS. The Tax Court found that even in light of this history, Kikalos failed to maintain adequate records relating to buydown income. The Court also found significant Kikalos' testimony that his practice of purchasing cashier's checks was designed in part to conceal large cash transactions from the IRS. The Tax Court therefore upheld the accuracy-related twenty percent penalty.

"[A] finding of negligence under § 6662 is a finding of fact that we review for clear error." *Reynolds*, 296 F.3d at 618. Moreover, determinations of negligence by the Commis-

sioner are presumed to be correct; the taxpayers bear the burden of proving that the penalties are erroneous. *Id*. The taxpayers maintain that they did keep adequate records but that the IRS agent refused to review them. They argue that the prior cases relating to other tax years are irrelevant to the present deficiency determination because buydown income had never before been an issue with the IRS and they had no expectation that the IRS would question these transactions. Kikalos contends that, despite his limited education, he maintained all the records the IRS asked him to keep to the best of his ability. He contests the Tax Court's reliance on his purchase of cashier's checks because he voluntarily produced all records of the check purchases after obtaining them from the bank at his own expense.

Each of these arguments is more specious than the last and none demonstrates clear error on the part of the Tax Court. The taxpayers had every opportunity at their hearing to produce records that supported their claims about buydown reimbursements. They produced less than one percent of the cash register tapes that they claim would have shown that buydowns were simply discounts passed directly on to consumers with no income to the stores. They failed to produce records demonstrating that they had already accounted in their business records for the buydown reimbursement checks that Kikalos converted to cashier's checks. They had to pay the bank to reconstruct the records of their cashier's check purchases only because they did not keep the original records. Although Kikalos may have had a limited education, he managed to run four profitable stores and hired an accountant to keep his records. Perhaps the boldest argument is that the taxpayers had no reason to expect that their handling of buydown transactions would be questioned by the IRS and therefore did not keep better records. The taxpayers' own accountant had no idea that Kikalos was using buydown reimbursement checks to purchase cashier's checks and Kikalos himself testified that

he engaged in this practice to avoid the attention of the IRS. Kikalos had every reason to expect that the IRS would someday ask for documentation for business transactions that involved hundreds of thousands of dollars. There was no clear error in the Tax Court's decision to uphold the accuracy-related penalty.

### III.

For the reasons stated above, we therefore affirm in its entirety the decision of the Tax Court.

AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*