T.C. Memo. 1998-383


UNITED STATES TAX COURT


EDWARD NATHAN LEVINE, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15656-96.                    Filed October 23, 1998.


Edward Nathan Levine, pro se.

<u>Jeffrey L. Heinkel</u> and <u>Lavonne Lawson</u>, for respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION


PARR, <u>Judge</u>:  Respondent determined deficiencies in, and additions to, petitioner's Federal income tax for 1987 and 1988 as follows:

| | | Additions to Tax | | | | |
|---|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(a)(1)(A) | Sec. 6653(a)(1) | Sec. 6653(a)(1)(B) | Sec. 6654 |
| 1987 | $2,294,259 | $573,565 | $114,713 | -- | [1] | $123,913 |
| 1988 | 102,259 | 25,700 | -- | $5,140 | -- | 6,573 |

[1] 50 percent of the interest due on $2,294,259.

By an amendment to answer, respondent asserts as his primary position an increase in the determination of deficiency for 1988 and additions to tax for fraud as follows:

| | | Additions to Tax | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6653(b)(1)(A) | Sec. 6653(b)(1) | Sec. 6653(b)(1)(B) | Sec. 6654 |
| 1987 | $2,294,259 | $1,720,694 | -- | [1] | $123,913 |
| 1988 | 110,500 | -- | $82,875 | -- | 6,573 |

[1] 50 percent of the interest due on $2,294,259.

All section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. All dollar amounts are rounded to the nearest dollar, unless otherwise indicated.

The issues for decision are: (1) Whether petitioner had unreported income of $5,948,020 and $367,360 in 1987 and 1988, respectively. We hold he did. (2) Whether petitioner is liable for additions to tax for fraud for 1987 and 1988, or, in the alternative, whether petitioner is liable for the additions to tax for failure to file tax returns for 1987 and 1988, and for negligence. We hold petitioner is liable for the additions to tax for fraud for 1987 and 1988. (3) Whether petitioner is liable for self-employment tax of $5,387 and $5,859 in 1987 and 1988, respectively. We hold he is. (4) Whether petitioner is liable for the additions to tax pursuant to section 6654 for failure to pay estimated income tax. We hold he is.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found. The stipulated facts and accompanying exhibits are incorporated into our findings by this reference. At the time the petition in this case was filed, petitioner resided in Lompoc, California.

On October 21, 1987, petitioner walked into the Bank of America in Sunnyvale, California (the Sunnyvale BoA) and rented three safe deposit boxes (the three boxes). The first safe deposit box was numbered 1 (box 1), the second, 6346E (box 6346E), and the third, 6348E (box 6348E). Petitioner filled each of the boxes with short stacks of U.S. currency bound with rubber bands.

Petitioner rented the three boxes in the name of Michael Stark, and he used a phony Missouri driver's licence in that name and a fictitious Social Security account number to verify his identification. On November 5, 1987, petitioner returned to the Sunnyvale BoA with a woman identified as Laura Dixon to add her as co-renter on the boxes.

In 1987, petitioner used the phony Michael Stark identification and fictitious Social Security account numbers to rent safe deposit boxes at three banks in San Jose, California, (the San Jose banks) as follows:

| Date | Box Number | Bank and Location |
|------|-----------|-------------------|
| October 22 | 2109N<br>2110N | Bank of America, San Jose |

| October 30 | 335 | First Interstate Bank, San |
| | 941 | Jose |
| November 23 | 49 | Security Pacific National |
| | 50 | Bank, San Jose |

Shortly after renting the boxes, petitioner returned to each of the San Jose banks to add Laura Dixon as co-renter, but they did not enter the boxes. All of the San Jose banks keep records, which are time and date stamped, of their customers' entries to the safe deposit boxes. Subsequent to the date that petitioner rented the boxes, he entered only three times; petitioner entered box 2110N at Bank of America, box 335 at First Interstate Bank, and box 49 at Security Pacific National Bank on October 23, November 5, and December 10, 1987, respectively.

Employees of the BoA-Sunnyvale were suspicious of petitioner's box-renting activity and called the Sunnyvale Public Safety Department (the police). Special Agent James R. Krehbiel (Krehbiel) of the Drug Enforcement Administration (DEA) was called in by the police to help investigate the case.

Krehbiel and the police determined that the Missouri driver's license petitioner used for identification to rent the boxes was not legitimate and that the address petitioner gave the bank as his local address belonged to a private mailbox business. In addition, the investigators brought two detector dogs to the bank vault with the boxes. The dogs, which are trained to sniff out illegal drugs, "alerted" to boxes numbered 1 and 6346E.

On the basis of the results of the investigation, Krehbiel obtained search warrants for the three boxes at the BoA-Sunnyvale. Krehbiel and police officers executed the warrants on January 15, 1988. Box 1 contained $570,520, box 6346E contained $707,800, and box 6348E contained $1,139,250. None of the boxes contained any thing other than currency, which was not tested for drug residue.

The investigators seized the currency, left a receipt in each of the boxes, deposited the currency in a different branch of the Bank of America, and received a cashier's check from the bank for $2,417,570 made payable to the U.S. Marshals Service.

On October 4, 1988, petitioner returned to the BoA-Sunnyvale to pay the rent on the three boxes. Bank employees delayed petitioner while they summoned the police. When the police officers arrived, petitioner identified himself as Michael Stark and produced the phony Missouri driver's license as proof of his identity. Petitioner was arrested by the police for presenting false identification to a police officer, and he was advised that he was to be charged with money laundering under the laws of the State of California. Upon his arrest, the police searched petitioner and found rent receipts for the safe deposit boxes at the San Jose banks.[1]

When the police arrived at the BoA-Sunnyvale, they noticed a woman standing next to a 1986 white 2-door Cadillac automobile

_____

[1]The Sunnyvale-BoA and the San Jose Banks are collectively referred to as the California Banks.

(the Cadillac) parked in front of an adjacent business. While petitioner was inside the bank, the police questioned him about what was in the three boxes, what he did for employment, and where he lived. In general, petitioner's answers to the police officers' questions were evasive; however, petitioner did admit that the Cadillac belonged to a woman whom he had met recently in a bar.

After arresting petitioner, the police observed the woman cruising the bank in the Cadillac. The police noted the license plate number and ran a registration check, which revealed that the Cadillac was registered to a Michael Stark. The police stopped the car, and the woman furnished a California driver's license in the name of Linda Lee Nelson (Nelson) for identification. Nelson told the police officers that the Cadillac belonged to Michael Stark, who had driven her to the bank and then told her to drive to the mall. Nelson gave the police officers permission to search the Cadillac; however, when they found a small bag of marijuana, she revoked her permission. Nelson was arrested, and the Cadillac was impounded.

David Harris (Harris), Criminal Investigator for the U.S. Customs Service (Customs), obtained search warrants for the boxes at the San Jose banks, and a warrant to search the Cadillac. The search revealed the boxes at the San Jose banks were filled with rubber band bound stacks of U.S. currency, which totaled $3,530,600. The search of the Cadillac yielded $27,620 in cash.

The State of California declined to prosecute the money laundering charges, and petitioner pleaded no contest to a misdemeanor violation of the vehicle code. Petitioner received a sentence of 15 days in the county jail. The charges against Nelson were dismissed.

On November 29, 1988, petitioner, using a phony Missouri driver's license in the name of Robert Morrison for identification, leased safe deposit box number 5507 (the box) from Universal Safe Deposit Corp. (Univault). Univault is a private safe deposit facility and computer tape storage business in New York, New York. Petitioner put a black attache case containing bundles of cash, which totaled $339,860, into the box. The next day, petitioner added Melinda Ferris as a joint lessee; however, petitioner did not enter the box after his initial visit.

The currency seized from the California banks eventually was forfeited to the United States. During the civil forfeiture proceedings, on January 20, 1989, attorneys for petitioner filed an opposing motion to the Government's motion for a default judgment with respect to the $2,417,570 found in the three boxes at the BoA-Sunnyvale. In this motion, petitioner claimed ownership of the $2,417,570 at issue, the $3,530,600 found in the boxes at the San Jose banks, and the 1986 white 2-door Cadillac.

Petitioner never filed income tax returns, paid any income tax, or filed estimated tax returns for 1987 or 1988.

Petitioner was indicted on or about February 24, 1989, in the Federal District Court, Middle District of Florida, for violation of Comprehensive Drug Abuse Prevention and Control Act of 1970, Pub. L. 91-513, secs. 401 and 406, 84 Stat. 1260, 1265, 21 U.S.C. sections 841 and 846 (1994), conspiring to distribute cocaine during the years of 1974 through 1984.  On or about September 28, 1989, petitioner was indicted in the Federal District Court, Northern District of California, for 18 counts of violation of Social Security Act, ch. 531, tit. II, sec. 203, 49 Stat. 625 (1935), 42 U.S.C. section 408(g)(2) (1988), misrepresentation of a Social Security account number in connection with opening the safety deposit boxes.  Petitioner fled before he could be arrested for these charges.

On February 28, 1995, U.S. marshals assisted by detectives from the City of Newport Police Department (the detectives) arrested petitioner and Nelson outside the house they rented in Glen Eden Beach, Oregon (the Glen Eden residence).  When arrested, petitioner had an Arizona driver's license which identified him as Joel Watnick, and Nelson had documents which identified her as Sherry Watnick.

Shortly after petitioner was arrested, petitioner's mother, Cecile Kasner (Kasner), arrived at the Glen Eden residence. Kasner was put under surveillance by the detectives.  On March 9, the detectives followed Kasner from the Glen Eden residence to a storage facility in the City of Newport where she retrieved a briefcase.

The detectives obtained a warrant to search Kasner's automobile and petitioner's residence.  The search of Kasner's automobile revealed a State of New York birth certificate in the name of Robert Morrison, a State of Missouri driver's license in the name of Robert Morrison, which displayed a picture of petitioner, and four handwritten notes on lined light-blue paper.

One of the notes, dated 3-7-95, was addressed to Univault and read as follows:

> To Whom it May Concern
>
> I, Robert Morrison, due [sic] hereby give authorization to Cecile Kasner to have a one time entry visit to my safety deposit Box #5507
>
> Thank You
>   Robert Morrison

Another note, which was not dated, read as follows:

> Dear Mom,
>
> I need your help.  There is a large attache (heavy) at my box in N.Y.  We need to remove it immediately.  Please help.  It is at Univault 115 East 57th St. under Robert Morrison & Melinda Ferris.  Please remove the case Box # 5507 You need authorization to enter-and the combination is 11-27-88?-My wedding day for entering into the vault area.
>
> Don't talk on the phone about your plans Don't talk to me on the phone about this.
>
>                   Love
>                    Edward
> [Bring your keys to N.Y.
> You can put the attache there

It is too heavy for you alone][2]

On March 12, 1995, the DEA used the notes along with other evidence to show probable cause for a warrant to search the box at Univault. The search revealed the attache case filled with $339,860 of cash, which the DEA seized. The DEA also seized Univault's records of the rental payments made on the box and the lease agreement between Robert Morrison and Univault.

After his arrest, petitioner agreed to plead guilty to one count of violating 42 U.S.C. 408(g), misrepresentation of a Social Security account number, and one count of violating 21 U.S.C. secs. 841 and 846, conspiring to distribute cocaine. The charges against Nelson were dismissed. Petitioner was incarcerated in a Federal prison in Lompoc, California, for 2 years and 8 months.

OPINION

Issue 1.  Whether Petitioner Had Unreported Income in 1987 and 1988

Respondent determined that petitioner had unreported income of $5,965,240 and $339,860, and deficiencies of $2,294,259 and $102,800 in 1987 and 1988, respectively. By an amendment to answer, respondent increased the deficiency for 1988 to $110,500, to account for the cash seized from the Cadillac. Petitioner asserts that he had no income during the years at issue, or, in the alternative, if this Court finds that he did have income, that it was no more than $48,900 in 1987 and $55,600 in 1988.

---

[2]This postscript was crossed out.

At trial, petitioner admitted that in 1987 and 1988 he rented the safe deposit boxes and that he put the bundles of cash into the boxes; however, petitioner argues that as there is no evidence that he was engaged in any illegal income-producing activity during 1987 and 1988, respondent has no grounds for charging him with unreported income for those years. Petitioner therefore is arguing implicitly that respondent's determination is arbitrary and erroneous.

In the usual case, a statutory notice of deficiency carries with it a presumption of correctness, and petitioner would have the burden of proving that respondent's determinations are erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). Courts have recognized a limited exception to this general rule in cases involving unreported illegal income where respondent introduced no substantive evidence but rested on the presumption of correctness, and the taxpayer challenged the notice of deficiency. Weimerskirch v. Commissioner, 596 F.2d 358 (9th Cir. 1979), revg. 67 T.C. 672 (1977); see also Dellacroce v. Commissioner, 83 T.C. 269, 280 (1984); Llorente v. Commissioner, 74 T.C. 260, 264 (1980), affd. in part and revd. in part 649 F.2d 152 (2d Cir. 1981); Jackson v. Commissioner, 73 T.C. 394 (1979).

We are satisfied that Weimerskirch v. Commissioner, supra, and its progeny are distinguishable. In Weimerskirch v. Commissioner, supra, respondent determined that the taxpayer had a deficiency in his income tax based upon a revenue agent's finding that the taxpayer omitted income derived from heroin

sales. The only evidence supporting this determination consisted of statements made to the agent by two confidential informants and certain information obtained by him from law enforcement officials. No admissible evidence was introduced at the trial to substantiate those statements or information otherwise linking the taxpayer to drug dealing. The Court of Appeals for the Ninth Circuit held that a "deficiency determination which is not supported by the proper foundation of substantive evidence is clearly arbitrary and erroneous" and that the Government had the burden of producing some evidence linking the taxpayer to an income-producing activity. Id. at 362. This is true even where that taxpayer has not made a showing that the notice was arbitrary. Id. at 361; Petzoldt v. Commissioner, 92 T.C. 661, 689 (1989).

The facts in the instant case, however, are more closely aligned with Delaney v. Commissioner, 743 F.2d 670 (9th Cir. 1984), affg. T.C. Memo. 1982-666; Tokarski v. Commissioner, 87 T.C. 74 (1986); and Schad v. Commissioner, 87 T.C. 609 (1986), affd. without published opinion 827 F.2d 774 (11th Cir. 1987). In each of these cases, the taxpayers possessed liquid assets or expended funds during the taxable year.

Respondent has offered ample evidence that petitioner was in possession of the funds respondent seeks to tax as income. In 1988, Government agents seized $27,620 from petitioner's Cadillac, and $5,965,240, which petitioner had put into safe deposit boxes in 1987. In 1995, the DEA seized $339,860 which

petitioner put into a safe deposit box in 1988. Furthermore, petitioner filed a claim for the money seized from the boxes at the California banks and for the Cadillac from which the $27,620 was seized. Finally, petitioner admits that he rented the boxes, and that he put the money into the boxes.

Respondent has connected petitioner to the funds that form the basis of the deficiency; the notice of deficiency was not arbitrary. Delaney v. Commissioner, supra; Schad v. Commissioner, supra; Tokarski v. Commissioner, supra.

Since respondent's deficiency notice was not arbitrary, petitioner has the burden of going forward with the evidence as well as the ultimate burden of persuasion. Dellacroce v. Commissioner, supra at 280.

Every taxpayer is required to maintain adequate records of taxable income. Sec. 6001. Petitioner did not file a Federal income tax return or make any estimated Federal income tax payments for any of the years at issue. Nor did he maintain adequate records from which the amount of his income or Federal income tax liability for any of the years at issue could be computed. In the absence of such records, respondent may reconstruct the taxpayer's income by any reasonable method that clearly reflects income. Sec. 446(b); Holland v. United States, 348 U.S. 121, 130-132 (1954); Parks v. Commissioner, 94 T.C. 654, 658 (1990). Respondent used the specific items method of proof to determine petitioner's income for the taxable years at issue. This method requires proof of specific items of income that were

omitted from petitioner's returns. United States v. Merrick, 464 F.2d 1087, 1092 (10th Cir. 1972). In this case, where petitioner has failed to keep the required records, respondent was justified in determining petitioner's tax liabilities for the years at issue by this method. Parrish v. Commissioner, T.C. Memo. 1997-474; McManus v. Commissioner, T.C. Memo. 1972-200, affd. without published opinion 498 F.2d 1399 (4th Cir. 1973).

Petitioner testified at trial that all of the money actually belonged to two men, "Cos" and "Bro", who gave him living expenses and drugs as gifts in appreciation of his renting the boxes and depositing the money into the boxes on their behalf. Petitioner estimated the value of these gifts was $48,900 in 1987, and $55,600 in 1988. Petitioner testified that when Cos and Bro needed to contact him they would beep him on his electronic pager. Petitioner testified that the last time he had contact with Cos and Bro was in 1988 when they gave him phony identification in the name of Robert Morrison and the attache case full of cash to deposit in the Univault box. Petitioner did not call Cos and Bro as witnesses or produce any other evidence that could verify his story.

Petitioner relies on only his testimony to carry the burden of proving the source of the bundles of cash. Thus, the issue is one of credibility wherein we must determine the extent to which the proffered testimony is believable. See Schad v. Commissioner, supra at 620.

It is well established that we are not required to accept self-serving testimony in the absence of corroborating evidence. Niedringhaus v. Commissioner, 99 T.C. 202, 212 (1992); Tokarski v. Commissioner, supra at 77. Moreover, our analysis of petitioner's testimony reveals inconsistencies that cast doubt upon his credibility. Thus, there is no credible evidence that the money actually belonged to Cos and Bro. Upon the basis of the entire record, we simply do not believe that the money came from the source petitioner claims. We find, therefore, that petitioner has not met his burden of proving a nontaxable source of the unreported income.

Issue 2. Additions to Tax for Fraud

Respondent asserts as his primary position that petitioner is liable for additions to tax for fraud pursuant to section 6653(b)(1)(A) and (B) for 1987, and section 6653(b)(1) for 1988. Petitioner asserts that respondent has failed to prove that the funds deposited in the various safe deposit boxes were his income, and that without such proof inferences of fraud cannot be drawn from his use of fictitious names and his concealment of the cash.

The existence of fraud is a question of fact to be resolved upon consideration of the entire record. Gajewski v. Commissioner, 67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978). Fraud is not to be imputed or presumed. Beaver v. Commissioner, 55 T.C. 85, 92 (1970); Otsuki v. Commissioner, 53 T.C. 96 (1969). Respondent

has the burden of proving that some portion of the underpayment is due to fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b); Parks v. Commissioner, supra at 660.

Respondent must prove both that an understatement of tax exists and the taxpayer intended to evade paying the correct tax. United States v. Rexach, 482 F.2d 10, 31 (1st Cir. 1973); Parks v. Commissioner, supra at 660-661. Where fraud is determined for each of several years, respondent's burden applies separately for each of the years. Estate of Stein v. Commissioner, 25 T.C. 940, 959-963 (1956), affd. per curiam sub nom. Levine v. Commissioner, 250 F.2d 798 (2d Cir. 1958). Where, as here, respondent has prevailed on the issue of the existence of a deficiency by virtue of petitioner's failure to carry his burden of proof, respondent cannot rely on that failure to sustain his burden of proving fraud. Parks v. Commissioner, supra; Petzoldt v. Commissioner, 92 T.C. at 700.

Respondent can satisfy his burden of proving the existence of an underpayment when the "allegations of fraud are intertwined with unreported and indirectly reconstructed income in one of two ways." Parks v. Commissioner, supra at 661. Respondent may prove an underpayment by proving a likely source of the unreported income. Holland v. United States, supra. Alternatively, where the taxpayer alleges a nontaxable source, respondent may satisfy his burden by disproving the nontaxable source so alleged. United States v. Massei, 355 U.S. 595 (1958).

Respondent maintains that the cash originated from petitioner's sale of illegal drugs. Respondent contends that petitioner's plea of guilty to conspiring to distribute cocaine in the years 1974 to 1985, petitioner's stipulation that he paid most of his living expenses during 1987 and 1988 using cash, cashier's checks, and money orders, the amount of cash found in the boxes, the use of the safe deposit boxes to conceal the money, and petitioner's use of fictitious identifications indicate that petitioner was involved in the activity of distributing illegal drugs.

Laurence M. Gallion (Gallion), a special agent with Customs testified that during the early part of 1987 Customs instigated an investigation of major drug smugglers on the West Coast. Among the suspected major smugglers investigated was petitioner.

Gallion testified that at the time of these investigations, Customs had a warehouse in San Francisco that was full of confiscated marijuana which it decided to sell in a reverse sting operation to suspected drug dealers. In the sting operation, Customs planned to sell the marijuana to the suspect, and then arrest the suspect for buying it.

Accordingly, Customs asked Paul Logan (Logan) to work for it as a confidential informant and to set up a marijuana deal with petitioner. Petitioner and Logan have known each other since sometime in the 1970's when Logan was a mid-level marijuana dealer in Miami, Florida. Furthermore, they have engaged in business with each other in the past; sometime around 1985,

petitioner sold Logan 10 pounds of high-potency "Thai weed" on consignment, for which Logan never paid petitioner.  Logan was in jail at the time Customs made its offer to him.

At trial, respondent introduced tape recordings of telephone calls made on February 18, February 23, and February 24, 1987, between Logan and petitioner.[3]

On these calls, Logan offered to sell petitioner a "4-digit number, starts with a one" quantity of "T-shirts" in "2.2 packages" for a price in the "mid-11s".  Petitioner has never

---

[3]At trial, petitioner objected to the introduction of the recordings as evidence, because they were made without his knowledge or consent in violation of the law of the State of California.
     Title 18 U.S.C. sec. 2511 (1994) prohibits interception and disclosure of wire, oral, or electronic communications, except as otherwise specifically provided.  Sec. 2511(2)(c) specifically provides:

> (c).  It shall not be unlawful under this chapter for a person acting under color of law to intercept a wire, oral, or electronic communication, where such a person is a party to the communication or one of the parties to the communication has given prior consent to such interception. [18 U.S.C. sec. 2511(2)(c) (West 1994).]

The recordings in this case were made by the U.S. Customs Service in connection with an official investigation of petitioner for drug trafficking, one of the parties in the telephone conversation, Logan, consented to the recordings, and the recordings were offered as evidence in a Federal court.
     Accordingly, the recordings were lawful as consensual wiretaps and are admissible as evidence. United States v. Kovac, 795 F.2d 1509, 1511-1512 (9th Cir. 1986) (whether the officials complied with State law is not relevant; the only question is whether the officials acted in compliance with Federal law); United States v. Adams, 694 F.2d 200 (9th Cir. 1982) (evidence obtained from a consensual wiretap conforming to 18 U.S.C. sec. 2511(2)(c) is admissible in Federal court without regard to State law).

been in the business of buying and selling T-shirts; however, he responded enthusiastically to the offer, saying "Well, you'd better get your [expletive deleted] over here and let's get to work." Petitioner also indicated that he was very interested in purchasing the entire quantity of what was offered for sale.[4]

Logan testified that when drug dealers speak on the telephone about illegal substances, they substitute ordinary words for incriminating words or terms. Thus, they use "4-digit number, starts with a one", for 1,000; "T-shirts" for marijuana; "2.2 packages" for packages of drugs that weigh 1 kilogram (kilos), and "mid-11s" for a $1,100 price range. Logan was therefore offering petitioner 1,000 kilos of marijuana for $1,100 per pound. Petitioner stated that he "could do the whole lot", which indicated his willingness to purchase the entire quantity of marijuana that Logan was offering for sale.

---

[4]Petitioner's willingness to purchase the entire quantity is indicated by the following recorded telephone conversation between Logan and petitioner (Voice 1 was identified as Logan; voice 2 as petitioner):

Voice 2:  We can do the whole lot real fast.

Voice 1:  Okay

Voice 2:  I guarantee it, the whole lot, real fast.

Voice 1:  One triple zeros.

Voice 2:  What's that?

Voice 1:  I've got a one and three zeros after.

Voice 2:  I know, man.  We can do the whole lot, real fast.

Petitioner and Logan agreed to meet at a restaurant in Emoryville, California, to further discuss the transaction. Logan brought an undercover DEA agent who was posing as a drug distributor with him to the meeting. Petitioner met with Logan; however, he did not agree to purchase the marijuana, because he recognized immediately that Logan's confederate was a Government agent.

Petitioner argues that the fact that he did not purchase the marijuana is proof he was not involved in the business of buying and selling illegal drugs. We disagree. In the recordings, petitioner's response to Logan's initial offer to sell him the marijuana was, "I've got people bugging me about that exact material right now and I ain't got a line on it." Petitioner's statement indicates that he had an existing customer base that depended on him as a source for marijuana. Thus, the evidence supports a finding that although petitioner was in the business of buying and selling marijuana, he was not interested in buying it from a DEA agent posing as a drug distributor.

We have stated that we doubt petitioner's credibility and that we find his story of the source of the unreported income implausible. Furthermore, we find that the evidence supports respondent's contentions that the likely source of petitioner's unreported income was the sale of illegal drugs. Accordingly, we find that respondent has met his burden of proving an underpayment by clear and convincing evidence.

Respondent must also prove by clear and convincing evidence that petitioner had the requisite fraudulent intent. Fraudulent intent may be proven by circumstantial evidence and reasonable inferences drawn from proven facts, because direct proof of a taxpayer's intent is rarely available. Spies v. United States, 317 U.S. 492, 499 (1943); Rowlee v. Commissioner, 80 T.C. 1111 (1983). Because respondent's assertion of fraud requires an inquiry into the taxpayer's frame of mind, a single act or omission seldom demonstrates the necessary fraudulent intent. Rather, the existence of the fraudulent intent must generally be determined by surveying a taxpayer's entire course of conduct. Stone v. Commissioner, 56 T.C. 213, 220 (1971); Bradford v. Commissioner, T.C. Memo. 1984-601, affd. 796 F.2d 303 (9th Cir. 1986).

Because fraudulent intent is rarely established by direct evidence, the Court of Appeals for the Ninth Circuit, the court to which this case is appealable, has inferred intent from various kinds of circumstantial evidence. Bradford v. Commissioner, 796 F.2d at 307. These badges of fraud include: (1) Understatement of income; (2) inadequate records; (3) failure to file tax returns; (4) implausible or inconsistent explanations of behavior; (5) concealing assets; and (6) failure to cooperate with tax authorities. Id. Furthermore, in Bradford, the Court of Appeals found that the following facts support a finding of fraud: (1) Engaging in illegal activities; (2) efforts to conceal such illegal activity; (3) dealing in cash to avoid

scrutiny of the taxpayer's finances; and (4) failure to make estimated tax payments. Id. at 308.

In the instant case, we find the following indicia of fraud: (1) Petitioner admitted that he did not file Federal income tax returns for the taxable years 1982 through 1994; (2) petitioner did not maintain records for the years at issue; (3) petitioner concealed assets by depositing cash in 10 safe deposit boxes in two states, and registering his Cadillac in a different name; (4) petitioner engaged in illegal business activities; (5) petitioner attempted to conceal his illegal business activities by concealing assets and using false identifications; (6) petitioner had substantial dealings in cash, including paying most of his bills during the years at issue with cash, cashier's checks, and money orders; (7) petitioner did not make estimated tax payments; and (8) petitioner's explanation of the source of the unreported income is implausible.

Upon consideration of all of the facts and circumstance of this case, we hold that respondent has carried his burden of proving petitioner's fraudulent intent with respect to the underpayments for the years at issue by clear and convincing evidence.

Issue 3. Whether Petitioner Is Liable for Self-Employment Tax

Respondent determined that petitioner is liable for self-employment tax of $5,387 and $5,859 in 1987 and 1988, respectively. Petitioner asserts that he had no income subject to self-employment tax during the years at issue.

Section 1401 imposes a tax on an individual's net earnings from self-employment. Self-employment income consists of gross income from any trade or business carried on by an individual less allowable deductions attributable to the trade or business. Sec. 1402(a). Respondent's determination that petitioner is liable for self-employment tax is presumed to be correct, and petitioner bears the burden of proving that it is erroneous. Rule 142(a); Kasey v. Commissioner, 33 T.C. 656, 660 (1960).

At trial, petitioner testified that he was not employed during 1987 and 1988, nor does he recall having a job or an employer from 1980 through 1994. We have found that petitioner had unreported income in 1987 and 1988. Although petitioner has persuaded this Court that he did not earn the unreported income as an employee, he has not met his burden of proving that he did not receive the unreported income from self-employment. Thus, we find that petitioner is liable for self-employment tax on the unreported income as determined by respondent for 1987 and 1988.

Issue 4.  Additions to Tax Under Section 6654

Respondent determined that petitioner is liable for additions to tax under section 6654(a) for his failure to make estimated tax payments for 1987 and 1988.

Subject to exceptions provided by statute, the imposition of the addition to tax is otherwise automatic if the amounts of the withholdings and estimated tax payments do not equal statutorily designated amounts. Niedringhaus v. Commissioner, 99 T.C. at 202; Grosshandler v. Commissioner, 75 T.C. 1, 20-21 (1980).

Petitioner bears the burden of showing that respondent's determination that section 6654 applies to the years in issue was made in error.  <u>Niedringhaus v. Commissioner</u>, <u>supra</u>.  Petitioner has made no such showing.  For the years in issue, petitioner had substantial taxable income; yet he made no tax payments.  Therefore, we hold he is liable for the additions to tax under section 6654(a) for those years.

To reflect the foregoing,

<u>Decision will be entered for</u>

<u>respondent.</u>