T.C. Memo. 2021-43

UNITED STATES TAX COURT

WILLIAM E. FLYNN, Petitioner <u>v.</u>
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 15975-14.                    Filed April 13, 2021.

William E. Flynn, pro se.

<u>Laurie B. Downs</u> and <u>Mark J. Miller</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

PARIS, <u>Judge</u>:  Respondent determined deficiencies and additions to tax in petitioner's Federal income tax as follows:

|  |  | | Additions to tax | |
| --- | --- | --- | --- | --- |
| Year | Deficiency | Sec. 6651(f) | Sec. 6651(a)(2) | Sec. 6654 |
| 1999 | $140,968 | $102,201.80 | $35,242.00 | $6,770.28 |

**[*2]**

| 2000 | 59,771 | 43,333.98 | 14,942.75 | 3,214.77 |
| 2001 | 32,918 | 23,865.55 | 8,229.50 | 1,315.53 |

Respondent's answer asserts in the alternative that to the extent the Court determines that petitioner is not liable for the additions to tax under section 6651(f),[1] he is liable for additions to tax under section 6651(a)(1) for 1999, 2000, and 2001.

The issues for decision are whether petitioner: (1) failed to report gambling income of $1,800, $3,745, and $20,000 for 1999, 2000, and 2001, respectively; (2) failed to report other income of $413,850, $200,941, and $113,836 for 1999, 2000, and 2001, respectively; (3) is liable for additions to tax for fraudulent failure to file under section 6651(f) for 1999 through 2001, or in the alternative for additions to tax for failure to file under section 6651(a)(1); (4) is liable for additions to tax for failure to timely pay under section 6651(a)(2) for 1999 through 2001; and (5) is liable for additions to tax for failure to pay estimated tax under section 6654 for 1999 through 2001.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]**                                    FINDINGS OF FACT

Some of the facts were deemed stipulated under Rule 91(f) and are so found.[2] The deemed stipulated facts and the exhibits attached thereto are incorporated herein by this reference. Additionally, some of the facts have been stipulated and are so found. The first stipulation of facts, the first supplemental stipulation of facts, the second supplemental stipulation of facts and the exhibits attached thereto, and the admitted exhibits are incorporated herein by this reference. Petitioner resided in Wisconsin when he timely filed his petition.

The Underlying Criminal Conspiracy Prosecution

1.    Access Financial

In or about 1998 Janet Mavis Marcusse and others organized Access Financial Group (Access), which they operated and promoted as an investment business. Petitioner began working for Access in 1999 after he met Marcusse and the others. Petitioner was included with the others in a Federal conspiracy investigation. From 1999 until approximately December 2001 petitioner worked to promote Access and managed a group of investors from northern Wisconsin.

---

[2]By order dated March 29, 2017, after the Court's hearing on the order to show cause under Rule 91(f), the Court deemed stipulated facts and evidence from the proposed stipulation of facts and made them part of the record.

[*4] From 1999 until April 2001 Access operated out of the basement of the residence of two of Access' managers.

Petitioner and his fellow conspirators at Access represented that Access was a successful investment organization with a history of returning large profits to clients. They promoted Access' connections to little-known, high-yield investment opportunities in world markets that were not available to the general public. Petitioner and his co-conspirators further represented to investors that their principal would be kept in guaranteed accounts in a major world bank and would not be at risk. Access claimed to operate as a tax-free church despite having had no churchlike organization, no building, no worship services, and no activities of a religious nature. Petitioner and his co-conspirators told investors that their returns on their investments would be nontaxable if they purchased a "church sub-chapter" package from Access. Many of the investors Access attracted were retirees who transferred their entire retirement accounts to Access on the representation that Access was eligible to receive the funds in those accounts as nontaxable rollovers and that the investors' profits would be tax free.

Investors were required to sign a nondisclosure and confidentiality agreement before receiving details of the investment. Access sent potential investors a "prospectus" that described the markets in which Access invested and

**[*5]** stated that these alleged markets were recognized and regulated by the U.S. Government, the Federal Reserve, and the International Chamber of Commerce. Investors were told that they would receive monthly "profit" payments and a return of as much as 20% on their principal. Access cautioned investors that they would be "thrown out" of the program if they talked about it to their accountants or the authorities.

Between 1998 and 2001 Access received approximately $20.7 million from approximately 577 investors. However, by May 2001 most of this money was no longer in the business, and Access began to default on its monthly "profit" payments to investors. Through 2001 and into 2002 Access represented to investors, orally and in newsletters, that these payment delays were temporary and that Access was continuing to invest their funds successfully. When some investors demanded that Access return their principal, they were told they were being "thrown out" of the program. In December 2001 Access closed its office, leaving investors with no information and no money.

2. Federal Investigation

In or about late 2001 the Federal Government initiated a criminal investigation into Access and its participants in the Western District of Michigan. Petitioner and Marcusse were subpoenaed by the grand jury; but they claimed the

[*6] grand jury had no jurisdiction to subpoena them, and they challenged the validity of Federal income tax laws. The Federal grand jury determined that, of the approximately $20.7 million in investors' funds received by Access, approximately $8.4 million was used to make monthly payments purported to be investment profits to existing investors. Marcusse and her co-conspirators diverted approximately $4.8 million for their personal use, and they further dissipated approximately $7.3 million in other transfers and payments.

On July 29, 2004, a Federal grand jury sitting in the Western District of Michigan returned a 40-count indictment charging petitioner and seven codefendants with mail fraud and conspiracy to commit mail fraud. On October 27, 2004, the grand jury returned an 83-count superseding indictment charging petitioner and the codefendants with mail fraud, conspiracy to commit mail fraud, money laundering, conspiracy to commit money laundering, and conspiracy to defraud the United States. The superseding indictment also included a count charging petitioner and each codefendant with criminal forfeiture of $10 million. Three of petitioner's codefendants pleaded guilty before trial.

On June 14, 2005, following a five-week trial in the U.S. District Court for the Western District of Michigan, a jury returned a guilty verdict on all counts against petitioner and his four remaining codefendants. On October 27, 2005, the

**[*7]** District Court held a sentencing hearing during which the court sentenced petitioner to 108 months' imprisonment followed by three years of supervised release. As a separate component of the sentence, the District Court ordered petitioner, jointly and severally with his codefendants, to pay restitution of $11,700,000 to the victims that were defrauded. The District Court's judgment was affirmed on appeal. See United States v. Flynn, 265 F. App'x 434 (6th Cir. 2008).

Petitioner's Investments

1. Billy's

Before joining Access petitioner, who generally went by the name Billy Flynn, owned and operated a bar in Wisconsin named Billy's. Petitioner had two bank accounts associated with Billy's: (1) a Bank North account ending in 4072 in the name of William E. Flynn d.b.a. Billy's (Bank North account) and (2) an Associated Bank account ending in 8244 in the name of Billy's LLC (Associated Bank account). Bank North and Associated Bank both mailed statements for their respective accounts to petitioner. These accounts were in addition to petitioner's F&M Bank account ending in 2696 in the name of William E. Flynn for which

[*8] petitioner and his daughter were the only signatories (F&M Bank account).[3]

On or about January 1, 1997, a fire destroyed Billy's bar and it ceased operation. After Billy's bar operations ceased, petitioner continued to use both accounts for personal expenses and other expenses unrelated to Billy's. On August 30, 1999, petitioner organized a single member LLC with the State of Wisconsin named Billy's LLC. On September 8, 1999, petitioner, as manager, opened a bank account in the name of Billy's LLC with Associated Bank which he continued to use until 2000. Petitioner also continued to use the Bank North account during 1999, 2000, and 2001, but never changed the account information from William E. Flynn d.b.a. Billy's.

    2.    Moonshine Hill Property

On December 1, 1998, petitioner made an offer to purchase a house on Moonshine Hill Road in Crivitz, Wisconsin (Moonshine Hill property). On January 27, 1999, petitioner submitted an application for a mortgage loan of $110,000 to F&M Bank for the purchase of the Moonshine Hill property. On his application petitioner claimed to be employed by Access with a total base monthly income of $5,000 and investments of $60,000. He submitted with the application

---

[3]On July 7, 2000, F&M Bank was acquired by Citizens Bank and the F&M Bank account became a Citizen's Bank account ending in 7824 (Citizen's Bank account).

[*9] various documents to support his stated income including: (1) a letter dated January 4, 1999, and signed by Marcusse on behalf of Access stating that petitioner had $60,000 invested in the company's self-styled "principal guaranteed product" that could be liquidated within five business days; (2) an Access payroll summary printout for the period of January 1 to December 28, 1998, signed by Marcusse that listed petitioner as an Access employee with gross pay of $78,000 and total Federal withholdings of $19,207.20; and (3) statements from petitioner's Bank North account. F&M Bank approved the mortgage loan on January 28, 1999. After closing, petitioner used the Moonshine Hill property as his principal residence during each of the years in issue.

During 1999 petitioner paid at least $48,267.37 for the purchase and subsequent loan payments for the Moonshine Hill property. Petitioner made loan payments of at least $10,800 in 2000, and payments of at least $9,836.35 in 2001 for the Moonshine Hill property.

3. <u>Pevos a.k.a. Cheeks Bar a.k.a Thunder Lake Lodge</u>

On or about October 12, 1999, petitioner contracted to purchase a bar named Pevos owned by Paul Blochowiak and an adjoining mobile home owned by petitioner's sister and Paul Blochowiak. As part of the purchase agreement, petitioner agreed to pay taxes Blochowiak owed for Pevos to Marinette County in

[*10] the State of Wisconsin, the balance due on a loan Blochowiak owed to M&I bank, and the cost of a flat screen TV Blochowiak purchased. Also as part of petitioner's purchase agreement on October 29, 1999, he wrote check No. 4804 drawn on his Bank North account that was made payable to Paul Blochowiak for $1,000. On October 28, 1999, Access deposited $65,000 into petitioner's Bank North account. Petitioner used these funds to pay off the back taxes and the M&I Bank loan. Petitioner sent the Marinette County treasurer a check for $5,243.89 drawn on his Bank North account dated October 29, 1999, to satisfy the unpaid taxes related to Pevos. On the same day petitioner issued Bank North check No. 4800, which was drawn on his Bank North account, for $58,053.01 to obtain personal money order No. 274925 in the same amount. Petitioner then used the money order to repay the balance of the loan that Blochowiak owed to M&I Bank. On November 19, 1999, petitioner received a deposit of $3,000 from Access into his Bank North account. On November 20, 1999, petitioner used this deposit to write check No. 4878 for $2,466.55 to Blochowiak for the flat screen TV.

On November 3, 1999, petitioner formed Cheeks as a limited liability company in the State of Wisconsin. On or about February 17, 2000, Paul Blochowiak transferred a warranty deed for the bar property to Cheeks, LLC. Petitioner operated the bar formerly known as Pevos under the new name of

[*11] Cheeks.  Cheeks LLC did not have a bank account and petitioner used his Bank North account checks reflecting the designations d.b.a. Billy's to operate the bar known as Cheeks.

Petitioner eventually contracted to remodel and improve Cheeks.  He engaged Dave Federici to carry out these improvements, including grading a dirt road.  During November and December 1999 petitioner paid Dave Federici with checks drawn on his Bank North account totaling $12,000 for his remodeling work on Cheeks.  Petitioner eventually changed the name of the bar from Cheeks to Thunder Lake Lodge.

### 4.  New Billy's Bar

Petitioner took steps to rebuild a bar named Billy's (new Billy's) on a piece of real estate on Newton Lake Road in Stephenson, Wisconsin (Newton Lake property).  Petitioner purchased the 4.65-acre property for $7,500 in 1997.  Petitioner engaged Jim Watson Excavating to begin preparing the Newton Lake property for the construction of new Billy's.  On October 26, 1999, petitioner received a wire transfer from Marcusse via Access for $20,000 that was deposited into his Associated Bank account.  The next day petitioner wrote a check to Jim Watson Excavating for $20,000 drawn on his Associated Bank account.  On

[*12] March 4, 2000, petitioner wrote a check to Jim Watson for $3,000 drawn on his Bank North account.

On May 4, 2000, petitioner signed an initial construction agreement with Corrigan's Custom Built Structures (Corrigan's) for the construction of a bar-nightclub facility on the Newton Lake property. The "estimated turnkey project cost" stated in the contract was $500,000 with a $50,000 downpayment due before the commencement of construction. Corrigan's would not commence construction until petitioner secured funding. On May 18, 2000, petitioner applied for a construction loan of $125,000 with F&M Bank. As part of the construction loan application paperwork, petitioner provided F&M Bank with an unsigned Form 1040, U.S. Individual Income Tax Return, for the 1999 year reporting adjusted gross income of $149,909. He also included a 1999 Form W-2, Wage and Tax Statement, generated by Access that showed wages of $144,000 with Federal income tax withheld of $35,726.40,[4] and a 1999 Schedule E, Supplemental Income and Loss, showing petitioner earned income of $5,742 from Cheeks LLC. On May 30, 2000, F&M Bank approved petitioner's construction loan request.

---

[4]The certified account transcript for petitioner's tax year 1999 does not reflect that this Form W-2 had been issued or that the referenced Federal income tax withholding had been deposited.

**[*13]** On June 15, 2000, petitioner signed a contractor and client agreement with Corrigan's that stated the actual cost of the proposed contract to be $217,413. On or about August 4, 2000, petitioner requested a change order that increased the total construction cost to $240,429.

5. Airplanes

 a. 1969 Cessna 337D Skymaster

In or about September 1999 petitioner entered into an agreement to purchase a 1969 Cessna 337D Skymaster airplane (Cessna 337D Skymaster) from Skymaster, Inc. On September 25, 1999, he wrote check No. 2554 payable to Skymaster, Inc., for $500 drawn on his F&M Bank account. On December 14, 1999 petitioner applied to F&M Bank for a home mortgage loan of $45,000 to pay for the Cessna 337D Skymaster (Cessna 337D loan). The Moonshine Hill property was the collateral for the Cessna 337D loan. On or about December 18, 1999, following F&M Bank's approval of the loan, petitioner paid Skymaster, Inc., $10,500 as a downpayment, leaving a balance due of $30,000. Petitioner was solely responsible for the monthly Cessna 337D loan payments to F&M Bank of $575 beginning on January 20, 2000. During 2000 petitioner made the required monthly payments to F&M Bank out of his F&M Bank account for a total of $6,900. In that same year he also wrote three $1,000 checks drawn on his Bank

[*14] North account to Wisconsin Aviation for flight training. During 2001 petitioner made monthly payments to F&M Bank totaling $3,450 out of his F&M Bank account.

On April 27, 2000, petitioner damaged the Cessna 337D Skymaster when a mechanical problem prompted him to make an emergency landing. After the accident petitioner attempted to sell the Cessna 337D Skymaster. On or about April 26, 2001, petitioner traded in the Cessna 337D Skymaster for a $33,250 credit towards his purchase of a replacement airplane, a 2001 American Champion Super Decathlon 8kCAB (American Champion 8kCAB). Eventually the balance of the Cessna 337D loan was foreclosed for failure to pay.

b. 1978 Cessna T310R

On September 3, 1999, petitioner organized Flynn's Properties, L.L.C. (Flynn's Properties). In or about May 2000 petitioner (through Flynn's Properties) entered into an agreement to purchase a 1978 Cessna T310R (Cessna T310R) for $190,000 with a downpayment of $19,000. As part of petitioner's purchase of his Cessna T310R, on April 27, 2000, petitioner wrote check No. 2571 as a downpayment to Darrel Massman for $5,000 from his F&M Bank account. On May 4, 2000, petitioner applied for a loan of $171,350 from Textron Financial Corp. (Textron) and listed Flynn's Properties as the plane's owner (Cessna T310R

[*15] loan).  Petitioner had formed Flynn's Properties with the State of Wisconsin on September 3, 1999.  While petitioner named both himself and his son Patrick Flynn as managers, petitioner was the sole owner of Flynn's Properties.

Petitioner provided Textron an aircraft financing application, a personal financial statement, a corporation form as petitioner was purchasing the airplane in the name of Flynn's Properties L.L.C., a handwritten letter stating that he planned to use the airplane to deal with his clients, and Forms 1040 for 1998 and 1999 as part of the financing application for petitioner's Cessna T310R loan.  In his application petitioner stated that he was employed by Access and received a monthly salary of $12,000 and that he was the sole owner of Cheeks LLC.  Petitioner represented that he had $30,000 in cash among his assets.  The Form 1040 for 1998 stated that petitioner had received Form W-2 income of $90,000 from Access.  The Form 1040 for 1999 stated that petitioner had received Form W-2 income of $144,000 from Access and Schedule E, income of $5,742 from Cheeks LLC.

Textron approved petitioner's Cessna T310R loan application on or about June 2, 2000.  Petitioner was solely responsible for making the monthly payments of $2,336.16 for the Cessna T310R loan.  During 2000 petitioner made payments from multiple accounts totaling $11,680.80 to Textron.  On August 24, 2000, he

[*16] also wrote check No. 2906 drawn on his F&M bank account to Daniel Massman to pay the remaining downpayment of $14,000. During 2000 Sanctuary Ministries (a purported church related to Access) made $2,336 in payments to Textron towards petitioner's Cessna T310R loan.

During 2001 petitioner made payments to Textron for the Cessna T310R loan totaling $18,689.28 from various accounts. These payments included at least $2,336 that Sanctuary Ministries American Heritage Church made to Textron on petitioner's Cessna 310R loan. Petitioner eventually fell behind on the monthly payments, and Textron ultimately repossessed the Cessna T310R.

c.      American Champion 8kCAB

Petitioner purchased the American Champion 8kCAB from the American Champion Aircraft Corp. for $133,250. On or around April 30, 2001, petitioner applied for a loan with Textron for $100,475 for the purchase of his American Champion 8kCAB (American Champion 8kCAB loan) and listed Flynn's Properties as the plane's owner. As part of the financing application for petitioner's American Champion 8kCAB loan, Textron was provided with a personal financial statement showing petitioner as owning his home, the Newton Lake Road property, and Cheeks bar; a Form W-2 from Access for 2000 showing

[*17] petitioner as receiving wage income of $327,578.16;[5] and printouts showing Flynn's Properties as being in good standing with petitioner as the registered agent.

Textron approved the American Champion 8kCAB loan on May 3, 2001. Petitioner was solely responsible for making the monthly payments of $1,036.49 for the American Champion 8kCAB loan. In 2001 petitioner made only four payments to Textron from various accounts totaling $4,249.60, none of which were paid on time. Petitioner ceased making payments on the American Champion 8kCAB loan after November 2001, and Textron repossessed the American Champion 8kCAB.

Deposits Into Petitioner's Bank Accounts

In addition to endorsing and depositing thousands of dollars in checks into his various bank accounts petitioner received numerous wire transfers depositing approximately $431,500 into these accounts during all the years in issue. During 1999, 2000, and 2001 petitioner deposited or received at least $383,850, $139,500, and $63,500, respectively, into his Bank North account. During 1999 petitioner deposited or received at least $20,000 into the Associated Bank account of Billy's

---

[5]The certified account transcript for petitioner's tax year 2000 does not reflect that this Form W-2 had been issued or the referenced Federal income tax withholding had been deposited.

[*18] LLC.  During 1999, 2000, and 2001 petitioner deposited or received at least $2,000, $56,500, and $40,000, respectively, into his F&M Bank account/Citizen's Bank account.

Wire Transfers

On February 23, 1999, petitioner withdrew $19,000 from his Bank North account.  On February 23, 1999, petitioner took $18,740 in cash to Angeli's County Market in Marinette County, Wisconsin (Angeli's Market), where he initiated two wire transfers of $9,000 each to Mary Oko and Ahmed Kabira in Nigeria on behalf of himself and an Access-related church entity named "Sanctuary Ministries".  When he made the wire transfers, petitioner indicated to Angeli's Market employees that he worked for Sanctuary Ministries.

On February 26, 1999, petitioner withdrew $86,000 from his Bank North account.  On the same day petitioner took cash to Angeli's Market, where he initiated multiple wire transfers totaling $85,000 to multiple people in Nigeria on behalf of himself and Sanctuary Ministries.  During this second visit petitioner again indicated that he worked for Sanctuary Ministries.  He further stated that he was sending the money to Nigeria for missionaries.

[*19] On March 18, 1999, petitioner withdrew $46,000 from his Bank North account that he used to obtain three cashier's checks for $9,000 and two cashier's checks for $9,500. Petitioner used the cashier's checks to initiate wire transfers in the same amounts to several individuals on behalf of himself and Sanctuary Ministries.

On March 29, 1999, petitioner withdrew $11,500 from his Bank North account that he used to initiate two wire transfers on behalf of himself and Sanctuary Ministries.

On March 16, 2001, petitioner took $20,000 to Angeli's Market. The $20,000 was not withdrawn from any of petitioner's bank accounts. On the same date petitioner initiated 10 separate wire transfers totaling $19,220 to Marcusse on behalf of himself and another Access-related church entity named Discovery Church. Petitioner told an Angeli's Market employee that he was had finished his theology degree and was now the church pastor at Discovery Church. He further stated that he was sending the money to Las Vegas to purchase land for his church.

Gambling Income

During each of the years in issue petitioner engaged in recreational gambling at various casinos. In 1999 petitioner played the slot machines in a casino owned by the Oneida Tribe of Indians of Wisconsin (Oneida casino). On

[*20] April 12, 2000, the Oneida casino filed with the Internal Revenue Service (IRS) Form W-2G, Certain Gambling Winnings, reporting that it paid $1,800 in gambling winnings to petitioner in 1999. In 2000 petitioner played bingo at the Hannahville Chip-In Casino in Michigan (Chip-In Casino). On March 21, 2001, the Chip-In Casino filed with the IRS Form W-2G reporting that it paid $3,745 in gambling winnings to petitioner in 2000. On or about March 26, 2001, 10 days after wire transferring money to Las Vegas, petitioner won a Keno jackpot while gambling at the Gordon Gaming Corp. d.b.a. Sahara Hotel and Casino in Las Vegas, Nevada (Sahara Casino). The Sahara Casino filed with the IRS Form 8852, Currency Transaction Report by Casinos--Nevada, that stated it made a cash payment of $20,000 to petitioner on that date. On March 21, 2002, the Sahara Casino filed with the IRS Form W-2G reporting the $20,000 as gambling winnings paid to petitioner in 2001.[6]

Tax Reporting for 1999 Through 2001

Petitioner claims that on February 14, 2003, he filed Forms 1040 for 1999, 2000, and 2001, each return being due before February 14, 2003. During his criminal trial petitioner introduced into evidence signed copies of these Forms

---

[6]Petitioner does not dispute receiving gambling income of $1,800 in 1999, $3,745 in 2000, and $20,000 in 2001.

[*21] 1040 for the subject years.[7] While the "copy" for 2001 reports gambling income of $20,000, the "copies" for 1999 and 2000 did not report gambling income petitioner received in those years. Nor did any of the "copies" report any funds or Form W-2 income received from Access or income or losses from Cheeks LLC. Petitioner's Internal Revenue Service (IRS) account transcripts do not record Forms 1040 as filed for any of the years in issue. Petitioner did not file a Federal income tax return for any of the tax years at issue.

Respondent's Determinations

In 2013 respondent prepared section 6020(b) substitutes for returns (SFR) for petitioner for 1999 through 2001. To prepare the SFR for each year in issue respondent relied on specific checks and wire transfers deposited into the aforementioned accounts, specific checks and wire transfers made to third parties on petitioner's behalf, and the above-mentioned Forms W2-G. The SFRs state that petitioner received unreported gambling income of $1,800, $3,745, and $20,000 for 1999, 2000, and 2001, respectively. The SFRs also state that

---

[7]The parties were unable to obtain copies of the purported Forms 1040 admitted into evidence during petitioner's 2003 criminal trial, and the District Court did not retain the exhibits. The amounts reported for the years in issue are drawn from the criminal trial transcript.

**[\*22]** petitioner received unreported other income of $413,850, $200,941, and $113,836 for 1999, 2000, and 2001, respectively.

On December 16, 2013, an employee of respondent with authority to sign a return prepared in accordance with section 6020(b) subscribed a Form 13496, IRC Section 6020(b) Certification, for each of the tax years in issue. Each Form 13496 referenced additional attached forms which make up the SFR including: Form 4549, Income Tax Examination Changes; Form 4549-A, Income Tax Discrepancy Adjustments; Form 5278, Statement--Income Tax Changes; Form 4667, Examination Changes--Federal Unemployment Tax; Form 4688, Employment Tax Examination Changes Report; and Form 886-A, Explanation of Items. Petitioner failed to pay any of the tax shown on each SFR. On April 3, 2014, respondent issued a notice of deficiency to petitioner for 1999, 2000, and 2001.

OPINION

I.    Unreported Income

A.    Burden of Proof

In general, taxpayers bear the burden of proving that the Commissioner's determination is erroneous. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In an unreported income case, if the Commissioner introduces evidence that the taxpayer received unreported income, the taxpayer must show by a

[*23] preponderance of the evidence that the deficiency determination was arbitrary and erroneous. Hardy v. Commissioner, 181 F.3d 1002, 1004 (9th Cir. 1999), aff'g T.C. Memo. 1997-97; see also Pittman v. Commissioner, 100 F.3d 1308, 1313 (7th Cir. 1996), aff'g T.C. Memo. 1995-243.

In order to shift the burden of proof as to a factual issue under section 7491(a), taxpayers must, among other things, introduce credible evidence as to the factual issue and maintain required records. Sec. 7491(a)(1) and (2). Petitioner has failed to do so.

B.    Gross Income

Gross income generally includes all income from whatever source derived. Sec. 61(a). Taxpayers must keep adequate books and records from which their correct tax liability can be determined. Sec. 6001. When a taxpayer fails to keep records, the Commissioner has discretion to reconstruct the taxpayer's income by any reasonable method that in the Commissioner's opinion clearly reflects income. Sec. 446(b); Cole v. Commissioner, 637 F.3d 767, 774-775 (7th Cir. 2011), aff'g T.C. Memo. 2010-31; Webb v. Commissioner, 394 F.2d 366, 371-372 (5th Cir. 1968), aff'g T.C. Memo. 1966-81; Factor v. Commissioner, 281 F.2d 100, 117 (9th Cir. 1960), aff'g T.C. Memo. 1958-94. The specific items method is a direct proof of income reconstruction this Court has approved. See Dyer v.

[*24] <u>Commissioner</u>, T.C. Memo. 2012-224, at *17.  Once the Commissioner produces clear evidence of unreported gross income, the taxpayer bears the burden of proving that the Commissioner's method of income reconstruction is unfair or inaccurate under the specific deposits method.  <u>See</u> <u>id.</u> at *18; <u>Levine v. Commissioner</u>, T.C. Memo. 1998-383, 76 T.C.M. (CCH) 731, 735 (1998), <u>aff'd without published opinion</u>, 229 F.3d 1158 (9th Cir. 2000).  To carry his burden, the taxpayer must offer "competent and relevant evidence from which it could be found that he did not receive the income alleged in the deficiency notice."  <u>Dyer v. Commissioner</u>, at *18 (quoting <u>Sharwell v. Commissioner</u>, 419 F.2d 1057, 1060 (6th Cir. 1969), <u>vacating and remanding</u> T.C. Memo. 1968-89).

In this case respondent used the specific items method to reconstruct the amounts of payments petitioner received from Marcusse, Access, and various other sources.  The record contains extensive banking records, canceled checks, and loan application records showing that petitioner received payments that he did not recognize as income for the tax years in issue.  The record also includes Form 4789, Currency Transaction Report, and Western Union money transfer records documenting petitioner's numerous domestic and international wire transactions with various individuals.

[*25] In full, the record shows sufficiently that petitioner received numerous payments from Access and others that he used for his personal and unrelated business expenses. Respondent also introduced Form 4789 as well as Western Union money transfer records documenting numerous wire transfers initiated by petitioner to Marcusse and various individuals. Each of these wire transfers was in an amount below the then reporting threshold of $10,000. Respondent has provided clear and convincing evidence that petitioner had unreported income for each of the years in issue. Respondent has provided evidence that petitioner not only received deposits of income into bank accounts that he controlled and additional payments made on his behalf, but also used that income for his own benefit.

Petitioner has provided no credible evidence demonstrating error in respondent's analysis, and he does not dispute the amount of funds received for any of the years in issue. Instead he argues that these funds deposited into his bank accounts and the funds he used to initiate wire transfers were investments made by Sanctuary Ministries and Discovery Church. Petitioner argues that the entities involved, including Cheeks LLC, Billy's LLC, and Flynn's Properties were formed by Access to hold title to investments made for the benefit of Sanctuary Ministries.

**[*26]** Petitioner provides no records supporting his claim that the businesses and assets were investments he made for Access on Sanctuary Ministries' behalf or that either entity was in any way involved. Nor was Sanctuary Ministries or Access referenced in any of the entity formation documents, sales agreements, or loan contracts. The record also amply demonstrates that petitioner, in his own name, applied for and received the numerous loans.

Similarly petitioner provides no records documenting the purpose of the numerous wire transfers he initiated to Marcusse and several individuals in Nigeria. The wire transfer records and Forms 4789 indicate that the transfers were made on behalf of petitioner and either Sanctuary Ministries or Discovery Church. They further state that petitioner is a "church employee". This information is based entirely on the information petitioner provided the company handling the wire transaction. Petitioner offers nothing further other than his own self-serving testimony, which the Court finds to be incredible. The fact that petitioner withdrew most of the funds from his bank accounts to initiate the wire transfers to seemingly random individuals is suspect in that, in part, each of the wire transfers was structured to be an amount below the $10,000 threshold for currency transaction reporting. See 31 U.S.C. sec. 5313 (1994); 31 C.F.R. sec. 103.22 (1998).

[*27] On the basis of the record the Court concludes that petitioner has failed to meet his burden to prove that respondent's method of income reconstruction is unfair or inaccurate under the specific deposits method for any of the relevant amounts deposited into petitioner's bank accounts. The Court concludes that the income deposited into petitioner's previously described bank accounts is taxable income to the extent described herein.[8]

## II.    Section 6651(f) Addition to Tax

Respondent determined petitioner was liable for the section 6651(f) fraudulent failure to file addition to tax for 1999, 2000, and 2001. Section 6651(a)(1) imposes an addition to tax for failure to timely file a Federal income tax return. This addition to tax equals 5% of the tax required to be shown on the return for each month or fraction thereof for which there is a failure to file a return, up to 25% in the aggregate. Section 6651(f) increases those respective percentages to 15% and 75% where the failure to timely file is fraudulent. In order to ascertain whether a taxpayer's failure to timely file was fraudulent under section 6651(f), the Court considers whether the taxpayer failed because of fraudulent intent to timely file a return for the taxable year where there was a tax

---

[8]Certain transactions that respondent determined were items of income were never established to have occurred. The total amount of the unreported income will be determined in a Rule 155 calculation.

[*28] liability required to be shown on a return.  See sec. 6651(a), (b)(1), (f);

Clayton v. Commissioner, 102 T.C. 632, 653 (1994); Porter v. Commissioner, T.C.

Memo. 2015-122, at *44.  The Commissioner has the burden of proving these

elements by clear and convincing evidence for each year for which fraud is

alleged.  Sec. 7454(a); Rule 142(b); Clayton v. Commissioner, 102 T.C. at 646;

Porter v. Commissioner, at *44.

### A.    Whether Petitioner Filed Valid Returns

Respondent first must prove that petitioner failed to timely file a required

Federal tax return.  See sec. 6651(a)(1).  Respondent may establish that

petitioner's income was sufficient to require filing a Federal tax return through

income figures petitioner supplied on a loan application.  See Trescott v.

Commissioner, T.C. Memo. 2012-321, at *8 (citing Driggers v. Commissioner,

T.C. Memo. 1997-354).  Petitioner submitted purported Forms W-2 with loan

applications to various banks, reporting that he earned enough income from

Access to require him to make a return for each of the years at issue.[9]  See secs.

6011(a), 6012(a)(1)(A).  Respondent introduced certified transcripts showing that

there is no record that petitioner ever filed Federal income tax returns for 1999,

---

[9]Petitioner's loan applications reflected Form W-2 wages of $90,000 for 1998, $144,000 for 1999, and $327,578 for 2000.

[*29] 2000, and 2001, nor did they reflect that any Federal income tax withholding was deposited on his behalf.[10]  Although petitioner submitted documents into evidence during his 2003 criminal trial that purported to be returns for the years in issue, he failed to provide proof that he actually filed any of those documents as a return for any of the years in issue.  Respondent has met his burden to establish that petitioner failed to file timely Federal income tax returns.

B.      Whether Petitioner's Failure To File Was Fraudulent

In determining whether a taxpayer had the requisite fraudulent intent for imposition of the section 6651(f) addition to tax, the Court considers the same elements that it considers in imposing the fraud penalty under section 6663 and former section 6653(b)(1).  Clayton v. Commissioner, 102 T.C. at 653; see Granado v. Commissioner, 792 F.2d 91, 93-94 (7th Cir. 1986), aff'g T.C. Memo. 1985-237.  Fraud is established by proving that a taxpayer intended to evade tax believed to be owing by conduct intended to conceal, mislead, or otherwise prevent the collection of tax.  Clayton v. Commissioner, 102 T.C. at 647; see Pittman v. Commissioner, 100 F.3d at 1319.  The existence of fraudulent intent is determined by looking at the entire record and the taxpayer's conduct.  See DiLeo

_____

[10]The SFRs for the years in issue are not returns for sec. 6651(a)(1) or (f) purposes.  See Porter v. Commissioner, T.C. Memo. 2015-122, at *45.

**[\*30]** v. Commissioner, 96 T.C. 858, 874 (1991), aff'd, 959 F.2d 16 (2d Cir. 1992). Fraud is never presumed and must be proven by independent evidence. Zell v. Commissioner, 763 F.2d 1139, 1143 (10th Cir. 1985), aff'g T.C. Memo. 1984-152; Beaver v. Commissioner, 55 T.C. 85, 92 (1970). Fraud need not be established by direct evidence, which is rarely available, but may be proved by circumstantial evidence and reasonable inferences drawn from the facts. Niedringhaus v. Commissioner, 99 T.C. 202, 210 (1992); see Pittman v. Commissioner, 100 F.3d at 1319.

In determining whether there was fraudulent intent, the Court will look at a nonexclusive list of factors. See Pittman v. Commissioner, 100 F.3d at 1319 (quoting Spies v. United States, 317 U.S. 492, 499 (1943)); Bradford v. Commissioner, 796 F.2d 303, 307 (9th Cir. 1986), aff'g T.C. Memo. 1984-601; Niedringhaus v. Commissioner, 99 T.C. at 211; Recklitis v. Commissioner, 91 T.C. 874, 910 (1988). These factors include: (1) failing to file income tax returns; (2) filing false documents, including false income tax returns; (3) understating income; (4) concealing income or assets; (5) engaging in illegal activity; (6) failing to cooperate with tax authorities; and (7) asserting frivolous arguments and objections to the tax laws. Bradford v. Commissioner, 796 F.2d at 307; Niedringhaus v. Commissioner, 99 T.C. at 211. While no single factor is

[*31] determinative for establishing fraud, the existence of several "badges of fraud" may constitute compelling circumstantial evidence of fraud. Bradford v. Commissioner, 796 F.2d at 307-308; Niedringhaus v. Commissioner, 99 T.C. at 211.

### 1. Failing To File Income Tax Returns

While the mere failure to file a return, standing alone, is not sufficient to support a finding of fraud, Niedringhaus v. Commissioner, 99 T.C. at 211, an extended pattern of failing to file returns is a badge of fraud and may be persuasive circumstantial evidence of the intent to evade tax, see Bradford v. Commissioner, 796 F.2d at 308; Petzoldt v. Commissioner, 92 T.C. 661, 701 (1989). Petitioner failed to file Federal income tax returns for 1999, 2000, and 2001. This factor weighs against petitioner for each of the years in issue.

### 2. Filing False Documents

Filing false documents with the IRS constitutes an "affirmative act" of misrepresentation sufficient to justify the fraud penalty. Zell v. Commissioner, 763 F.2d at 1146. Petitioner never filed Federal income tax returns for the years in issue, and there is no evidence he filed with the IRS false documents that he used to obtain various loans. But filing false documents with a third party supports an inference of fraud. See Isaacson v. Commissioner, T.C. Memo. 2020-17, at *54.

**[\*32]** In light of petitioner's repeated use of false employment and Federal tax documents with multiple financial institutions, this factor indicates fraudulent intent.

### 3. Understating Income

A pattern of substantially underreporting income for several years is strong evidence of fraud, particularly if the understatements are not due to innocent mistake or are not otherwise satisfactorily explained. See Holland v. United States, 348 U.S. 121, 137-139 (1954); Spies, 317 U.S. at 499; Pittman v. Commissioner, 100 F.3d at 1319-1320; Marcus v. Commissioner, 70 T.C. 562, 577 (1978), aff'd without published opinion, 621 F.2d 439 (5th Cir. 1980). Petitioner at his criminal trial provided his purported Forms 1040 for 1999 through 2001, which admitted that he failed to report significant amounts of income received from Access and Marcusse as income for 1999, 2000, and 2001. He did include that income on loan applications, and that inconsistency weighs against petitioner. He also failed to report gambling income for 1999, 2000, and 2001. This factor weighs against petitioner for 1999, 2000, and 2001.

### 4. Concealing Income and Assets

An intent to evade tax may be inferred from "concealment of assets or covering up sources of income". Spies, 317 U.S. at 499. Concealing assets

[*33] coupled with a failure to file tax returns is a strong indication of fraud. Freidus v. Commissioner, T.C. Memo. 1999-195, 1999 WL 391919, at *10. A taxpayer's use of nominee corporations is evidence of asset concealment. See Bennett v. Commissioner, T.C. Memo. 2014-256, at *12, aff'd, 690 F. App'x 934 (9th Cir. 2017).

Petitioner claims that he formed and used the various entities and accounts to house assets purchased as investments on behalf of Access. The entities and accounts petitioner used neither reference Access nor were managed as assets purportedly held for the benefit of the victims of the Access scheme. Furthermore, nothing in the record supports petitioner's contention that he used any of the entities or accounts on behalf of, or in partnership with, Access or any Access-related entities. The bank accounts he opened, the loans he received, and the assets he purchased were used, at least to a significant extent, to conceal the amounts he received from his participation in the Access scheme. This factor weighs against petitioner for each of the years in issue.

### 5. Engaging in Illegal Activity

Engaging in an illegal activity is a badge of fraud. See Niedringhaus v. Commissioner, 99 T.C. at 211. In each of the years in issue petitioner participated in an illegal pyramid scheme for which he was prosecuted and convicted.

**[*34]** Petitioner played an active role in convincing victims to invest their savings, including retirement savings, in the Access scheme. Victims' funds were never invested on their behalf, and amounts Access paid as purported investment proceeds to its earlier victims were paid, at least in part, with funds received from subsequent victims. Instead of investing the victims' funds petitioner, Marcusse, and the other Access co-conspirators spent a good portion of the money for their own benefit. Petitioner used the funds he received from Marcusse and the Access scheme to purchase his personal residence, two bars, and three airplanes as well as to pay for construction of new Billy's and to generally support his lifestyle. In addition, the razzle-dazzle of Billy Flynn's loan applications enticed the lenders to approve multiple loans to him and his various entities in amounts exceeding $550,000, and the payments on the loans were made from his previously described bank accounts. This factor weighs against petitioner for each of the years in issue.

### 6. Failing To Cooperate With Tax Authorities

Failure to cooperate with revenue agents during an audit is a badge of fraud. Grosshandler v. Commissioner, 75 T.C. 1, 19-20 (1980); see Zell v. Commissioner, 763 F.2d at 1146; Toushin v. Commissioner, 223 F.3d 642, 647 (7th Cir. 2000), aff'g T.C. Memo. 1999-171. Petitioner gave inconsistent and misleading testimony during his Federal criminal trial. And his testimony during

[*35] trial in this case was implausible and unreliable. He also submitted additional false Federal income tax returns for years 1999 through 2001 into evidence during the criminal trial. This factor weighs against petitioner.

### 7. Asserting Frivolous Arguments

Frivolous, irrelevant, and meritless arguments, coupled with affirmative acts designed to evade Federal income tax, support a finding of fraud. See Kotmair v. Commissioner, 86 T.C. 1253, 1259-1261 (1986); Porter v. Commissioner, at *58; see also Toushin v. Commissioner, 223 F.3d at 647. Petitioner asserted frivolous arguments to criminal investigators in the Western District of Michigan, and he has consistently maintained those arguments in this proceeding. This factor weighs against petitioner.

### C. Conclusion

Taking the entire record into account, the Court concludes that petitioner's failure to file tax returns for 1999, 2000, and 2001 was fraudulent. Although petitioner submitted a purported Form 1040 for each of the years in issue as evidence in his 2003 criminal trial, he provided no evidence that any of those documents was a valid timely return. Petitioner's failure to file a valid return for each year was deliberate and intended to conceal the fact that he had income subject to tax. Respondent has proven fraudulent intent by showing that petitioner

[*36] committed affirmative acts of concealment or misrepresentation with respect to each year. See Zell v. Commissioner, 763 F.2d at 1146. Petitioner is therefore liable for the addition to tax under section 6651(f) for 1999, 2000, and 2001.[11]

In view of our determination that petitioner is liable under section 6651(f), the Court need not address respondent's alternative position that petitioner is liable under subsection (a)(1).

III.    Section 6651(a)(2) Addition to Tax

Respondent determined that petitioner is liable for additions to tax under section 6651(a)(2) for failure to timely pay his 1999, 2000, and 2001 Federal tax liabilities. Section 6651(a)(2) imposes an addition to tax on taxpayers for their failure to pay timely the amount of tax shown on a return. This addition to tax applies only when an amount of tax is shown on a return, unless it is shown that the failure is due to reasonable cause and not due to willful neglect. See Wheeler v. Commissioner, 127 T.C. 200, 208-209 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Repetto v. Commissioner, T.C. Memo. 2012-168, slip op. at 38. Where the taxpayer did not file a valid return, as is the case here, the Commissioner must

---

[11]The sec. 6651(f) addition to tax is not subject to the supervisory approval requirements under sec. 6751(b). See sec. 6751(b)(2)(A); see also Hendrickson v. Commissioner, T.C. Memo. 2019-10, at *26, aff'd per order, 2020 WL 2563412 (6th Cir. Apr. 2, 2020).

**[\*37]** introduce evidence that a substitute for return under section 6020(b) was prepared to satisfy the burden of production. See sec. 6651(g)(2). To satisfy his burden of production, respondent must produce sufficient evidence that petitioner filed returns showing tax liabilities for the years at issue. See Wheeler v. Commissioner, 127 T.C. at 210. A return prepared by the Commissioner in accordance with section 6020(b) is treated as the return filed by the taxpayer for the purpose of determining the amount of the addition under section 6651(a)(2). Sec. 6651(g)(2); Wheeler v. Commissioner, 127 T.C. at 208-209.

Respondent has the burden of proving that substitutes for returns satisfying the requirements of section 6020(b) were submitted. See Cabirac v. Commissioner, 120 T.C. 163, 170-171 (2003), aff'd per curiam without published opinion, 2004 WL 7318960 (3d Cir. Feb. 10, 2004); see also Wheeler v. Commissioner, 127 T.C. at 210. To constitute a section 6020(b) substitute for return, "the return must be subscribed, it must contain sufficient information from which to compute the taxpayer's tax liability, and the return form and any attachments must purport to be a 'return'." Rader v. Commissioner, 143 T.C. 376, 382 (2014) (quoting Spurlock v. Commissioner, T.C. Memo. 2003-124, slip op. at 27), aff'd in part, dismissed in part, 616 F. App'x 391 (10th Cir. 2015). The Court has held that the requirements of section 6020(b) have been met where the

**[\*38]** substitutes for returns consist of Forms 4549-A, Forms 886-A, and Forms 13496. Id.

The substitutes for returns at hand included Forms 4549-A, Forms 886-A, and Forms 13496. Further, the substitutes for returns purport to be "section 6020(b) returns", contain the information necessary to calculate petitioner's liabilities, and are subscribed. The substitutes for returns constitute valid section 6020(b) returns for 1999 through 2001. Accordingly, respondent has satisfied his burden.

Once the Commissioner meets his burden, the burden of proof is with the taxpayer to show that the additions to tax that the Commissioner determined in the notice of deficiency should not be imposed. See Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001). Petitioner's burden requires that he prove that his failure to timely pay his Federal income tax was due to reasonable cause and was not due to willful neglect. See sec. 6651(a)(2). Petitioner did not pay any of his tax liabilities for 1999 through 2001, and he has failed to present any evidence that would establish that his failure to pay was due to reasonable cause and not due to willful neglect. The additions to tax under section 6651(a)(2) for those years are sustained.

**[*39]** IV.    Section 6654 Addition to Tax

Respondent determined that petitioner is liable for an addition to tax under section 6654(a) for failure to pay estimated income tax for 1999, 2000, and 2001. Section 6654(a), (b), and (c) imposes an addition to tax on an individual taxpayer to the extent he underpays a required installment of estimated tax.  The addition to tax is calculated with reference to four installment payments each equal to 25% of the required annual payment.  Sec. 6654(c)(1), (d)(1)(A).  The "required annual payment" is generally the lesser of (1) 90% of the tax shown on the return for the taxable year (or, if no return is filed, 90% of the tax for such year), or (2) 100% of the tax shown on the taxpayer's return for the preceding taxable year.  Sec. 6654(d)(1)(B) and (C).  Option (2) does not apply where a taxpayer has not filed a return for the preceding taxable year.  Id. subpara. (B) (flush language).

The Commissioner has the burden of production with respect to the section 6654 addition to tax.  Sec. 7491(c).  To satisfy that burden, the Commissioner, at a minimum, must produce evidence establishing that the taxpayer had a "required annual payment" as defined in section 6654(d)(1)(B).  Wheeler v. Commissioner, 127 T.C. at 211-212.  This burden requires the Commissioner to produce evidence that allows the Court to determine the amount of the required annual payment. See sec. 6654(d)(1)(B); Wheeler v. Commissioner, 127 T.C. at 212.  To determine

[*40] the amount of petitioner's required annual payment for those years, the Court must know whether petitioner filed a return for the preceding taxable year and, if so, the amount of "tax shown" on that return. See sec. 6654(d)(1)(B)(ii). Thus, respondent must introduce evidence showing whether petitioner filed a return for each preceding year and, if he did, the amount of "tax shown" on that return. See id.; see also Wheeler v. Commissioner, 127 TC at 212.

Respondent introduced evidence that petitioner last filed a Federal income tax return in 1995 and that he did not file a Federal income tax return for 1998, 1999, 2000, or 2001. Petitioner had no withholdings and did not make any estimated tax payments for years 1999, 2000, and 2001. Therefore, given that petitioner had an unpaid Federal tax liability for each of those years, respondent met his burden under section 7491(c) to show that for 1999, 2000, and 2001 petitioner had a required annual payment under section 6654(d)(1)(B) but did not make any estimated tax payments.

Petitioner failed to introduce any evidence to show that he did not have required annual payments for the tax years at issue. Petitioner also presented no evidence that he qualified for any exception to the requirements for estimated tax payments under section 6654(e). Petitioner is therefore liable for the section 6654(a) additions to tax.

**[\*41]** The Court has considered all of the parties' arguments, and, to the extent not addressed above, the Court concludes that they are moot, irrelevant, or without merit.

To reflect the foregoing,

<u>Decision will be entered</u>

<u>under Rule 155</u>.